904 P.2d 245 (1995)
127 Wash.2d 628
The STATE of Washington, Respondent,
v.
Blake Richard PIRTLE, Appellant.
No. 60661-7.
Supreme Court of Washington, En Banc.
October 12, 1995.
Reconsideration Denied January 19, 1996.
*251 Blake Pirtle, Walla Walla WA, pro se.
Joan M. Fisher, Genesee, ID, for appellant.
James Sweetser, Spokane County Prosecutor, Kevin Korsmo, Deputy, Spokane, WA, for respondent. *246 *247 *248 *249
*250 JOHNSON, Justice.
Defendant Blake Pirtle was convicted in Spokane County Superior Court of two counts of aggravated murder and sentenced to death. Pirtle appealed directly to this court, raising numerous issues. The State cross-appealed as to two issues. After considering the arguments and conducting our own statutorily mandated review, we affirm Pirtle's conviction and death sentence.

FACTS
When Terra Kanzler arrived for work at 8 a.m. at the Argonne Road Burger King in Spokane on May 17, 1992, she found the restaurant locked. Alarmed, she called the police. When officers entered the Burger King, they found the bodies of Tod Folsom and Dawnya Calbreath. Tod was lying on the floor of the main office in a pool of blood. He had suffered severe head and neck injuries, and a hacksaw was found on his back. His hands had been bound behind his back with plastic tape formed into handcuffs.
The body of Dawnya Calbreath was found on the floor of a cooler. She had also suffered a head injury and severe neck and hand wounds. Plastic tape was found on her body, although her hands were free. A stained knife was found near her body. Signs of a struggle were visible throughout the back of the building. Blood and paint were found throughout. Material had been discharged from a fire extinguisher.
The restaurant had been robbed; $4,200 was missing. The telephone line was found cut. A burned egg on the grill indicted the victims had been surprised while opening the restaurant.
Autopsies of the victims revealed that Tod's skull was "crushed" by a blow from a blunt object while his head was resting against a hard surface. Tod's neck was cut after he was unconscious. There were nine wounds to the front of the neck and eight to the back. They could have been caused by the knife or the hacksaw. He had no defensive wounds.
Dawnya suffered three to five blows to the head. She had a hairline skull fracture. A paint can was identified as the probable instrument *252 causing the injuries. Dawnya's neck was cut after she lost consciousness. The blade of a knife had been drawn across the neck at least 16 times, cutting through to the spinal bone at the back of the neck. She also suffered knife wounds to her hands. The examining doctor speculated the probable sequence of events was that she received the knife wounds to her hands trying to defend herself, was knocked unconscious from blows of the paint can, and that her neck wounds were later inflicted by the knife and possibly the hacksaw.
Trial testimony from several Burger King customers and employees provided information about the events of the morning. Wesley LeDoux had worked that night at the restaurant and had left shortly before 7 a.m. Dawnya was alone. Joie Taylor, a customer, used the drive-through window about 7:15 a.m. and was told by Dawnya that service was somewhat slow because Tod had not arrived.
Within minutes, David Schmidt, apparently the next customer to use the drive-through window, was told by a man who was not dressed in a Burger King uniform that the restaurant would not open for another 20 minutes. At 7:25 a.m., the panic alarm in the cooler was activated. The alarm was relayed to a security company, but Burger King had closed its account there. A dispatcher tried telephoning the restaurant, but received a disconnect message. He did not take any other action because the account was closed.
The investigation quickly focused on Pirtle. At about 7:50 on the morning of the murders, a neighbor saw Pirtle drive to his mother's house, where he was living. He got out of the car and carried a big green garbage bag into the house. At about 8:30 a.m., he left again in his mother's car.
The garbage bag was later found and seized by sheriff's deputies pursuant to a warrant. Inside the bag, they found paint-stained clothing, a fire extinguisher, a knife, and three plastic gloves. Crime scene investigators identified three fingerprints and four barefoot prints found at the scene as Pirtle's.
Pirtle also had a motive. On May 4, a Burger King assistant manager fired him for sexual harassment. Dawnya attended the termination interview as a witness for the manager. On May 14, Pirtle pulled up to the drive-through window and ordered coffee. Dawnya was standing next to another employee at the window. Pirtle warned the other employee not to talk to him because he would sexually harass her. Then as he left, he said, "They'll see". Report of Proceedings, vol. 9 at 1686.
Pirtle was arrested with a female companion at a Spokane motel the evening of May 17. His body was stained with paint. He told officers he had been at the restaurant, but had left before the killings took place. He attributed the murders to a "whacked out junkie" named "Joe".
On May 20, Pirtle was charged by information with two counts of aggravated first degree murder, alleging the aggravating factors that the murders were part of a common scheme or plan, were committed in the course of robbery, and were committed to conceal the commission of the crime of robbery or to protect or conceal the identity of any person committing the crime. On June 19, notice of intent to seek the death penalty was filed. Trial was set for May 24, 1993.
While Pirtle was in custody awaiting trial, a reporter and a Burger King employee received letters from "Joe" stating he was free to kill again while the Defendant was in jail taking the blame for the killings. The "Joe" letters were later determined to have been written by a jail inmate at Pirtle's request. Pirtle then sent them to a friend who placed them in the mail.
On June 9, the trial began. Defense counsel told the jury in opening that his client had committed the killings but disputed they were premeditated. The defense focused primarily on the Defendant's mental capacity at the time of the slayings. Various friends and family members testified about Pirtle's alcohol and drug use during the week before the crime.
Blake Pirtle took the stand on his own behalf to try to establish a diminished capacity defense. He testified to a long history of drug use, but said he had not used hard drugs in several months until being fired. *253 Then, on both Thursday and Saturday before the killings, he injected cocaine and "crystal meth". After injecting methamphetamine late Saturday night, he became paranoid and started hallucinating. He contended the effect of the drugs was diminishing on Sunday morning and that he wanted more, so he decided to rob the Burger King.
Pirtle testified he took a knife from his kitchen and left. He said he waited next to the restaurant until LeDoux left. He then went to the back door, buzzed, and was allowed entry by Tod, stating he was Wesley LeDoux. He told Dawnya he was robbing the restaurant and cut the telephone cord. He then had her open the safe and confirmed that it was open. He had Dawnya tie up Tod before he did the same to her. Pirtle put the two employees in the freezer and rolled the portable freezer in front of it. He admitted he then took Dawnya's keys and emptied the tills and the safe, putting the money into bank deposit bags.
Pirtle testified he was ready to leave when the drive-through lane signal went off. He told the customer the restaurant would not be open for 20 minutes. As he was walking back he saw the bread knife and picked it up. He then took Dawnya, who had freed her hands, out of the cooler and tried to "intimidate" her. According to Pirtle's own testimony, a struggle ensued, resulting in the knife wounds to her hands. He said when he saw the blood he "snapped" and grabbed a paint can. He struck her twice to knock her down, and then twice more with a different can. He then cut her throat with the knife.
Pirtle testified he then talked Tod into leaving the cooler and walking to the office. Pirtle told him he intended only to knock him out, convinced him to remove his glasses and lie down face down. Pirtle hit Tod twice with the fire extinguisher, and then used the knife to cut his throat. At that point he said he heard sounds coming from Dawnya and returned to her to cut her throat further.
Pirtle testified he removed his clothing, put in it a bag, and put on some old clothes from the restaurant. He set the bags down outside and went and got his car. He then drove the short distance back to Burger King, loaded the bags in the car, and went home.
The defense also offered extensive expert testimony in an effort to establish Pirtle's diminished capacity to premeditate. Dr. Dennis Pollack, a clinical psychologist, testified the Defendant was drug and alcohol dependent and had a personality disorder with antisocial and borderline features. Because of these mental disorders, Dr. Pollack did not believe the Defendant had the ability to premeditate.
Dr. Karen Sheppard, another clinical psychologist, testified Pirtle's frontal lobes had been impaired by drug use, making it difficult for him to evaluate a situation, organize, and come to a decision.
Clinical psychologist Dr. Phillip Murphy testified Pirtle had likely suffered a temporal lobe seizure during the killings. He believed the Defendant could not therefore premeditate the killings.
Dr. Jonathan Lipman, a neuropharmacologist, testified concerning the effects of drugs on the brain. He explained the temporal lobe may develop heightened sensitivity to drugs with repetitive use. This reverse tolerance can result in a sudden "kindling" or seizure. When the temporal lobe goes into seizure, the result is extreme and explosive rage. This explosive dyscontrol is frequently characterized by repetitive stabbing motions. According to Lipman, Pirtle had an abnormally large temporal lobe with scarring in an area responsible for explosive rages.
The State called Dr. Roy Mays, a Spokane psychologist, in rebuttal. Mays testified the Minnesota Multiphasic Personality Inventory (MMPI) results of Pirtle were invalid and that nothing in the test results indicated a neurological problem or mental incapacity.
After surrebuttal, the court heard exceptions to instructions. The defense asked for additional instructions dealing with premeditation. The defense further requested first degree felony murder instructions, challenging the decision of this court in State v. Irizarry, 111 Wash.2d 591, 763 P.2d 432 (1988), on the issue of whether felony murder is a lesser included of some aggravated murders. *254 The trial court refused the requested instructions.
On June 25, the jury found Pirtle guilty on count 1 (Dawnya Calbreath) with two aggravating circumstances: murder in the course of a robbery and as part of a common scheme or plan. On count 2 (Tod Folsom), the jury returned a verdict of guilty of first degree murder, finding three aggravating circumstances: robbery, common scheme or plan, and concealment.
During the special sentencing proceeding, the State introduced the Defendant's five adult and ten juvenile convictions, including both misdemeanors and felonies.
The defense called Dr. Pollack and the Defendant's half sister, who both described violence committed by the Defendant's father against the Defendant and other family members. Clinical psychologist Robin LeDue described fetal alcohol syndrome and testified the Defendant had the same pattern of problems apparent in persons suffering from fetal alcohol syndrome and who function best with external structure and control. The Defendant exercised his right of allocution and asked for forgiveness and mercy.
The jury returned a verdict of yes to the special sentencing issue on both counts. Pirtle was sentenced to death on July 27, 1993. This appeal and automatic review followed.

ANALYSIS

Pretrial Issues
1. Notice of the special sentencing proceeding.
Pirtle argues the prosecutor determined to seek the death penalty prior to any consideration of the evidence in mitigation and refused to extend the thirty-day deadline for filing notice of the special sentencing proceeding to permit the defense to present mitigation evidence. He contends there was a failure to consider mitigating evidence, constituting an abuse of the discretion afforded prosecutors to seek the death penalty under RCW 10.95.040(1). We disagree.
According to the affidavit of Pirtle's trial attorney, the prosecutor conveyed the decision to seek the death penalty on May 20, 1992, the day Pirtle was charged, which was only three days after the murders. The affidavit goes on to concede, however, the prosecutor said he would accept mitigating evidence. The affidavit also states on June 1 the prosecutor refused to extend the deadline for the defense to gather mitigation evidence. However, again the affidavit notes the prosecutor offered to wait until the end of the thirty-day period before filing the notice of intent. And, in fact, the prosecutor did not file the notice of intent until June 19, thirty days later.
We have held a prosecutor's discretion to seek the death penalty is not unfettered. See State v. Campbell, 103 Wash.2d 1, 24-25, 691 P.2d 929 (1984), cert. denied, 471 U.S. 1094, 105 S.Ct. 2169, 85 L.Ed.2d 526 (1985). Before the death penalty can be sought, there must be "reason to believe that there are not sufficient mitigating circumstances to merit leniency." Campbell, 103 Wash.2d at 25, 691 P.2d 929 (quoting RCW 10.95.040(1)). The prosecutor must perform individualized weighing of the mitigating factorsan inflexible policy is not permitted. In re Harris, 111 Wash.2d 691, 693, 763 P.2d 823 (1988), cert. denied, 490 U.S. 1075, 109 S.Ct. 2088, 104 L.Ed.2d 651 (1989). Input from the defendant as to mitigating factors is normally desirable, because the subjective factors are better known to the defendant while other factors, such as age and lack of prior criminal record, can be readily ascertained by the prosecutor. Harris, 111 Wash.2d at 694, 763 P.2d 823.
Had the prosecutor in this case announced a decision on May 20 and then refused to accept any additional evidence, it would indicate an unwillingness to engage in the individualized weighing required in Harris. However, that is not what happened here. The prosecutor announced a tentative decision, specifically said he would look at mitigating evidence developed by the defense, and then waited the full thirty days.
Even without input from the defense, the prosecutor had a substantial amount of information about Pirtle. Pirtle was born in Spokane and lived most of his life there. His contact with law enforcement officers had *255 been extensive. He had ten juvenile convictions, including three for second degree burglary. He had five adult convictions, including one for first degree theft and another for felony assault. Because of Pirtle's history, the prosecutor had some information about each of the statutory mitigating factors, with the possible exception of the Defendant's mental state at the time of the crime.
Given what the prosecutor already knew and his willingness to wait thirty days to see if the defense could develop additional information, we find the prosecutor did not abuse his discretion.

Guilt Phase Issues
2. Sufficiency of the evidence of premeditation.
At trial, Pirtle admitted killing Dawnya Calbreath and Tod Folsom, but denied the killings were premeditated. He argues the jury verdict of aggravated first degree murder was not supported by sufficient evidence of premeditation, particularly given the evidence of cocaine intoxication and the "kindling effect" of drugs he ingested before the murder. To the contrary, we find more than sufficient evidence of premeditation.
Errors alleged in the guilt phase of a capital case are reviewed by this court in the same way as those in a noncapital case. State v. Lord, 117 Wash.2d 829, 849, 822 P.2d 177 (1991) (Lord I), cert. denied, ___ U.S. ___, 113 S.Ct. 164, 121 L.Ed.2d 112 (1992). The test for reviewing a defendant's challenge to the sufficiency of evidence in a criminal case is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt". State v. Gentry, 125 Wash.2d 570, 596-97, 888 P.2d 1105 (1995), cert. denied, ___ U.S. ___, 116 S.Ct. 131, ___ L.Ed.2d ___; State v. Green, 94 Wash.2d 216, 221-22, 616 P.2d 628 (1980) (following Jackson v. Virginia, 443 U.S. 307, 318, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979)). All reasonable inferences from the evidence are drawn in favor of the State. Gentry, 125 Wash.2d at 597, 888 P.2d 1105. Premeditation may be proved by circumstantial evidence where the inferences drawn by the jury are reasonable and the evidence supporting the jury's finding is substantial. Gentry, 125 Wash.2d at 597, 888 P.2d 1105.
Premeditation must involve "more than a moment in point of time," RCW 9A.32.020(1), but mere opportunity to deliberate is not sufficient to support a finding of premeditation. State v. Bingham, 105 Wash.2d 820, 827, 719 P.2d 109 (1986). Rather, premeditation is "the deliberate formation of and reflection upon the intent to take a human life" and involves "the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short." Gentry, 125 Wash.2d at 597-98, 888 P.2d 1105 (quoting State v. Ortiz, 119 Wash.2d 294, 312, 831 P.2d 1060 (1992); State v. Ollens, 107 Wash.2d 848, 850, 733 P.2d 984 (1987); State v. Robtoy, 98 Wash.2d 30, 43, 653 P.2d 284 (1982); State v. Brooks, 97 Wash.2d 873, 876, 651 P.2d 217 (1982)).
Four characteristics of the crime are particularly relevant to establish premeditation: motive, procurement of a weapon, stealth, and the method of killing. Ortiz, 119 Wash.2d at 312, 831 P.2d 1060. The second and third factors can be further combined as evidence of planning. Our review of the record reveals sufficient evidence of these factors to support the jury's finding that both murders were premeditated.
Pirtle had at least two motives to kill Dawnya: in revenge for her role in his firing from the Burger King for sexual harassment, and to prevent evidence of his new crimes from being considered during his upcoming sentencing for felony assault in Montana. The second motive could have applied to Tod as well.
There was evidence Pirtle planned to kill. Although there was a fairly large sum of money in his home, Pirtle decided to rob the one business establishment in the vicinity where he was well known and could be identified, and he did not bring a disguise. At trial, he testified he took a knife from his kitchen with him to the Burger King. He drove to a church approximately a half block from the Burger King, parked, and watched *256 the Burger King. He waited several minutes until another employee, Wesley LeDoux, left the restaurant before obtaining entry by pretending to be Wesley. He thought Dawnya was alone.
Once in the Burger King, Pirtle took out his knife, cut the telephone cord, and had Dawnya open the safe in the office and give him her keys to the cash registers. He saw that Dawnya and Tod were bound and then put them into the freezer before emptying the cash drawers and the safe. He testified he put away his own knife and picked up a bread knife from a counter, then removed Dawnya from the freezer before killing her.
The method of killing also supports premeditation. Pirtle took Dawnya into the walk-in cooler where he struck her several times in the head with two paint cans, then, after she was already unconscious and lying on the floor, he cut her throat. Both Pirtle's testimony and physical evidence show Dawnya resisted the attack.
Pirtle then talked Tod into leaving the freezer and walking to the office, telling Tod he only wanted to knock him out. He convinced Tod to take off his glasses and lie face down on the floor, whereupon he hit Tod twice with a fire extinguisher, then retrieved a knife and cut Tod's throat after he was unconscious. There were nine wounds to the front of Tod's neck and eight to the back of his neck, which could have been caused either by the knife or by a hacksaw found on Tod's body.
After killing Tod, Pirtle returned to the cooler and cut Dawnya's throat some more, as Pirtle testified, "because her body was makin' noises." Report of Proceedings, vol. 12 at 2103. He sawed at her throat with the knife at least sixteen times, nearly decapitating her. The examining physician speculated the hacksaw also may have been used on Dawnya's neck.
Following the murders, Pirtle had the presence of mind to change clothes, gather the robbery proceeds and some of the evidence into a garbage bag, bring his car to the rear of the Burger King, and load the full garbage bag into the car. He drove home, cleaned up the car and himself, and hid the evidence in a compost pile in a neighbor's yard. The above facts, many of which are drawn from Pirtle's own testimony, are sufficient to establish premeditation.
This court has found sufficient evidence of premeditation on facts similar to these. In Ollens, 107 Wash.2d at 853, 733 P.2d 984, we found sufficient evidence of premeditation where a weapon was used, multiple wounds were inflicted, the victim's throat was cut after infliction of the other wounds, the victim was struck from behind, and there was evidence of a motive such as robbery. In Ortiz, 119 Wash.2d at 312-13, 831 P.2d 1060, we found sufficient evidence of premeditation where the murder was committed with a knife procured on the premises, the murder was committed in a room different from where the knife was procured, multiple wounds were inflicted, the victim was struck in the face with something other than the knife, and defensive wounds on the victim suggested a prolonged struggle.
In Gentry, we reviewed several cases in which there was evidence sufficient to establish premeditation. See, e.g., State v. Rehak, 67 Wash.App. 157, 834 P.2d 651 (1992) (evidence showing the victim was shot three times in the head, twice after he had fallen on the floor), review denied, 120 Wash.2d 1022, 844 P.2d 1018, cert. denied, ___ U.S. ___, 113 S.Ct. 2449, 124 L.Ed.2d 665 (1993); State v. Massey, 60 Wash.App. 131, 803 P.2d 340 (1990) (evidence the defendant brought a gun to the murder site), cert. denied, 499 U.S. 960, 111 S.Ct. 1584, 113 L.Ed.2d 648 (1991); State v. Gibson, 47 Wash.App. 309, 734 P.2d 32 (evidence of a brief lapse of time between blunt force blows to the head and later strangling), review denied, 108 Wash.2d 1025 (1987); State v. Sargent, 40 Wash.App. 340, 698 P.2d 598 (1985) (evidence the victim was struck by two blows, with some interval of time between the blows, while the victim was lying face down). The evidence of premeditation in this case is at least as compelling as in the cases Gentry reviewed.
The facts in this case are sufficient for a rational jury to have found beyond a reasonable doubt that Pirtle considered his actions for the requisite time before killing Dawnya Calbreath and Tod Folsom, and thus to support *257 the jury's verdict that Pirtle's murder of Dawnya and Tod was premeditated.
Pirtle's reliance on the effect of drugs to negate premeditation is misplaced. The jury heard evidence from several experts that Pirtle suffered impaired mental processes at the time of the murders due to his drug abuse. However, the testimony was hardly unequivocal.
Dr. Dennis Pollack opined Pirtle did not have the ability to premeditate because of his impaired mental condition. On cross examination, however, the State adduced testimony suggesting Pirtle intentionally attempted to make himself look bad during testing, and that many of the tests administered did not allow a conclusion to be drawn as to Pirtle's ability to premeditate the killings. Dr. Pollock revealed his definition of premeditation required Pirtle to have preplanned the crime in an organized and systematic fashion, and he acknowledged Pirtle had the capacity to make the decision to commit a crime, to plan it, and to execute his plan.
Dr. Karen Sheppard testified Pirtle showed marked improvement in his response to tests she administered just before trial, compared with the tests administered by Dr. Pollack 11 months earlier. She attributed Pirtle's earlier mental impairment to drug use, and described Pirtle as having been "mildly" impaired at the time of Dr. Pollack's tests. Report of Proceedings, vol. 13 at 2335. At no point, however, did she state Pirtle lacked the capacity for premeditation.
Dr. Phillip Murphy diagnosed Pirtle as suffering from "seizure disorder, psychomotor or temporal lobe type" and opined that Pirtle had a temporal lobe seizure at the time of the murders. Report of Proceedings, vol. 14 at 2371. Under cross examination, he admitted that much of his diagnosis was based on Pirtle's version of the events at the Burger King and that a person of even borderline intelligence could recognize his statements in such circumstances might be incriminating.
Dr. Jonathan Lipman described the "kindling" phenomenon in cocaine intoxication and how it is detected. It was his opinion that Pirtle's brain was kindled by cocaine at the time of the killings and that it was highly likely Pirtle suffered a psychotic episode leaving him unable to premeditate. The State elicited testimony from Dr. Lipman that the use of cocaine may induce anger and boldness, enhancing a person's "energy to fulfill a motive," and reducing the person's inhibitions. Report of Proceedings, vol. 14 at 2528. He also admitted a person under the influence of drugs could still carry out an intent to do something.
The State effectively cross-examined each expert witness, providing a factual basis sufficient for the jury to find Pirtle's capacity for premeditation was not eliminated by his mental condition, by cocaine intoxication, or by "kindling" of his brain at the time of the murders. Viewing this expert testimony in the light most favorable to the prosecution, with all reasonable inferences drawn in favor of the State, the record is sufficient to conclude any reasonable jury could have found Pirtle capable of premeditation in the murders of Dawnya Calbreath and Tod Folsom.
3. Admissibility of prior felony assault.
Pirtle maintains the trial court erred in admitting, over defense counsel's objection, his guilty plea and pending sentencing for felony assault in Montana as evidence of motive under ER 404(b) and as impeachment under ER 609. We disagree.
We review a trial court's decisions as to the admissibility of evidence under an abuse of discretion standard. State v. Lane, 125 Wash.2d 825, 831, 889 P.2d 929 (1995).
We look first at admissibility under ER 404(b), which provides:
Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
To admit evidence of other wrongs under ER 404(b), the trial court must (1) find by a preponderance of the evidence that the misconduct *258 occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value of the evidence against its prejudicial effect. State v. Lough, 125 Wash.2d 847, 853, 889 P.2d 487 (1995). Because Pirtle had pleaded guilty to the assault, the first element was not an issue.
The purpose for which the State offered the evidence and for which the trial court admitted it was motive. The State's theory was that Pirtle had a motive to kill any witnesses who could identify him as the perpetrator of the robbery because he had a conviction pending in Montana, for which the sentence might have been more severe if he were linked to a robbery in Washington. The prosecutor argued motive was relevant because the Defendant was going to take the stand and deny premeditation.
The Defendant argues this court considered the same theory and found it implausible in State v. Tharp, 96 Wash.2d 591, 637 P.2d 961 (1981). There, the State's theory was that the defendant's furlough status provided a motive to kill the victim, because if apprehended his period of incarceration would have been considerably extended. Tharp, 96 Wash.2d at 595, 637 P.2d 961. We found the theory did not support motive, because the defendant allowed the victim to leave the scene initially. The victim voluntarily returned, an argument ensued, and the defendant shot the victim.
Tharp is distinguishable from the case at hand for two reasons. First, the defendant there was charged with second degree murder, a crime that does not require proof of planning or premeditation. Second, the facts of that crime do not support the theorized motive. In allowing the victim to leave, the defendant did not try to cover up the crime. After the victim came back, however, the men argued, and the argument appears to have led to the shooting. Given these facts, it is implausible that a longer period of incarceration played a role in the defendant's decision to shoot the victim.
In this case, Pirtle is charged with premeditated first degree murder and the aggravating factor of killing in order to conceal the crime of robbery. The Defendant took the stand to deny premeditation, and the prosecutor sought to introduce the pending sentence to rebut Defendant's testimony. In these circumstances, the existence of a motive to conceal is certainly relevant to whether there was premeditation and the aggravating factor of killing to conceal a robbery. This case is also different from Tharp because the facts of the crime support premeditation, as discussed above. The theory that the Defendant planned from the beginning to kill any witnesses was certainly plausible.
The Defendant also maintains the trial court failed to carefully consider the prejudicial effect of such evidence against its probative value under ER 403. In admitting the evidence, the trial court said:
... the testimony with respect to motive in any case has great probative value, and the prejudice here to the defendant is significant, but the value of the testimony that's been offered in this particular case has far greater probative value than that. It clearly outweighs the prejudice to the defendant, and for that reason, it will be admitted.
Report of Proceedings, vol. 12 at 2073.
In this case, we believe the trial court's weighing was sufficient. The court's statement immediately followed extensive arguments by both sides with regard to the ER 403 balance. The prosecutor's argument was that motive is probative of premeditation and prejudice would be minimal because there would be no attempt to bring out any details of the crime and because four other earlier felonies were clearly admissible under ER 609. The defense argued that because the death penalty was charged, heightened scrutiny was required, and the plea should therefore not be admitted. We think it clear from this record that the court agreed with the prosecutor and did not need to reiterate the prosecutor's argument.
In State v. Jackson, 102 Wash.2d 689, 694, 689 P.2d 76 (1984), we stated the requirement for on the record balancing both facilitates appellate review and ensures that *259 the judge gives thoughtful consideration to the issue. In this case, both objectives were met. We therefore find Pirtle's felony plea and pending sentence were properly admitted under ER 404(b). Because the plea was properly admitted under this rule and there is no issue as to limiting instructions, we need not address whether the plea could also have been admitted under ER 609.
4. Admissibility of photographs.
A. The "in-life" photographs
The trial court denied Pirtle's motion in limine to exclude the "in-life" photographs of the victims, which the State sought to introduce to prove the identity of the victims. In order to take the issue out of the trial, Pirtle offered to stipulate as to the identity of the victims. The State, however, refused that stipulation and insisted on proving identity through the admission of the challenged photographs. We review the decision to admit the photos for abuse of discretion and find none.
We have previously addressed this issue in State v. Rice, 110 Wash.2d 577, 757 P.2d 889 (1988), cert. denied, 491 U.S. 910, 109 S.Ct. 3200, 105 L.Ed.2d 707 (1989). In that aggravated first degree murder case, the State offered four "in-life" photographs, one of each victim. As in this case, the defendant offered to stipulate as to the identity of the victims, but the State refused and the trial court admitted the photographs. We first analyzed the relevancy of the photos under ER 401 and then potential unfair prejudice under ER 403. Rice, 110 Wash.2d at 598, 757 P.2d 889.
ER 401 states:
"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.[1]
Because the information in Rice alleged named victims were killed, the prosecution had the burden of proving the victims' identity. Thus, any evidence tending to prove the identity of the victims was relevant under ER 401. Rice, 110 Wash.2d at 598-99, 757 P.2d 889.
In Rice, we further held the defendant's offer to stipulate to the victims' identity did not negate the relevance of the "in-life" photographs.
[T]he State is not automatically precluded from presenting its evidence on an issue merely because the defendant offers a stipulation.... If the State does not agree to the stipulation, the issue remains open and the State can proceed to prove its case in the manner that it sees fit, subject to the restrictions of ER 403 and other rules of evidence.... Stated in a slightly different way, the State is not bound to stipulate to the defendant's offer unless unfair prejudice substantially outweighs the proffered evidence's relevance.
Rice, 110 Wash.2d at 598-99, 757 P.2d 889. We thus held the State need not accept a defendant's offer to stipulate on the issue of identity and may insist on proving the issue in the manner it wishes.
The prosecution's prerogative is not unlimited, however. While the holding in Rice and its application to this case are clear, we wish to stress that a stipulation as to identity normally increases judicial efficiency without compromising any element of the State's case. Allowing the defendant to "plead out" of an essential element would indeed prevent the State from presenting a "complete picture" of the events to the jury, but the identity of the victim is not an essential element of the crime of aggravated first degree murder. The decision as to whether to admit evidence of a victim's identity where the defendant offers to stipulate is within the discretion of the trial court and is not automatic.
*260 Once the trial court has determined such evidence is relevant, it must determine whether its probative value is substantially outweighed by unfair prejudice to the defendant.
The Defendant argues that instead of showing the "in-life" photos (Exs. 169 and 170[2]) for the purpose of proving identity, the State could have used certain autopsy photos that showed the victims' faces (Exs. 94 and 98). The autopsy photos, however, are clearly more prejudicial than the "in-life" photos. In light of the gruesome photos of the victims that were also before the jury, it cannot be said that the "in-life" photos could have added much additional prejudice. See State v. Furman, 122 Wash.2d 440, 452, 858 P.2d 1092 (1993) ("`In life' pictures are not inherently prejudicial, particularly where as here the jury has seen `after death' pictures of the victim's body"). The trial court, therefore, did not abuse its discretion in admitting the "in-life" photographs of the two victims.
B. Crime scene and autopsy photographs
The Defendant next argues certain of the crime scene and autopsy photographs are duplicative and inflammatory and their probative value does not outweigh their prejudicial effect. Specifically, Pirtle contends Exhibits 15 and 16 are duplicative; 18 and 19 are duplicative; 27 and 28 are duplicative; 29, 30, 31 and 32 are inflammatory and duplicative of 33; 98, 99 and 100 are inflammatory and duplicative; and 102 and 103 are inflammatory and duplicative.
An examination of the challenged photographs reveals the trial court did not abuse its discretion by allowing their admission. Exhibits 15 and 16 are not duplicative. Exhibit 15 shows the position in which Tod Folsom's body was found in relation to the room. In the background, it shows a portion of the blood splatter pattern on the wall. Exhibit 16 shows a closeup of the full splatter pattern on the wall. It shows only a portion of the body in the foreground.
The trial court did not abuse its discretion in admitting both Exhibits 18 and 19. Exhibit 18 shows Tod's chest with his right arm lying across it. The photo shows there is cellophane tape wrapped around his right wrist. Exhibit 19 shows the right arm being held up, showing the inside of the wrist and demonstrating there was another section of the cellophane tape that could have been used to bind Tod's wrists together. As the trial court noted, this is a closer call, but there is enough to differentiate the two photographs such that this court cannot say the trial court abused its discretion in admitting both photos.
Exhibits 27 and 28 are not duplicative. Exhibit 27 shows Dawnya Calbreath's body in relation to the room in which she was found. The photo was taken through the doorway into the room and shows only the top part of her body. This photo also shows a number of footprints in relation to the body that are not shown in 28. Exhibit 28 shows the entire body in the position in which it was found. This is a much closer view of the body and shows greater detail.
Exhibits 29 through 32 are not duplicative of exhibit 33. Exhibit 33 shows Dawnya's entire body and shows an investigator holding up a roll of tape with a length of unrolled tape that was found running down the length of her upper body. Since the tape is being held up, this photo does not show it in its original position. Exhibit 32 shows the roll of tape in the position it was originally foundon the floor, behind the body, just below her waist. It also shows paint and blood that are not visible in Exhibit 33. Exhibit 31 shows a closeup of the tape, in its original position, along the torso. Exhibit 30 shows a closeup of the tape still higher on the body. Finally, Exhibit 29 gives a closeup view of the back of the head where the length of tape begins. Because Exhibits 29 through 32 show different views of the tape in the location in which it was originally found, and Exhibit 33 shows the entire length of tape being held up over the *261 body by an investigator, they are not duplicative and there was no error in admitting them.
Exhibits 98, 99 and 100 are perhaps the most disturbing of all the photographs admitted at trial. Each shows a different view of the wound on Dawnya's neck. Exhibit 98 gives a front view of the neck, showing the length of the cut. Exhibit 99 shows a view from the left side of the neck. This photo shows the depth of the cut as well as the extent of the damage that cannot be seen from either of the other two views. Exhibit 100 shows the view from the right side. Again, this photo shows details that cannot be seen in the other two. While these photos are certainly inflammatory, the court's decision that their probative value outweighed their prejudicial effect was not an abuse of discretion.
The Defendant is mistaken in asserting that Exhibits 102 and 103 are duplicative. Each shows a different wound on Dawnya's skull. Exhibit 102 shows a wound near the front of the head, while Exhibit 103 shows a wound farther back on the head.
The photographs challenged by the Defendant were not duplicative. The fact the photographs were gruesome and therefore potentially inflammatory does not change the result. This was a gruesome and horrible crime. It simply cannot be presented to a jury in a way that glosses over that fact. Moreover, it should be noted the prosecutor exercised a good deal of restraint in selecting the photos to be presented to the jury. There are some 50 photographs, marked collectively as Exhibit 172, which were not presented but are part of the record. An examination of these photos reveals they show relevant details but are substantially more gruesome than those actually used. The trial court committed no error in admitting the challenged photos.
5. Reasonable doubt instruction.
Pirtle challenges the reasonable doubt instruction,[3] which reads as follows, in pertinent part:
A reasonable doubt is one for which a reason exists and may arise from the evidence of lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly and carefully considering all of the evidence or lack of evidence. If, after such consideration[,] you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt. If, after such consideration[,] you do not have an abiding belief in the truth of the charge, you are not satisfied beyond a reasonable doubt.
Instruction 3 (Clerk's Papers, vol. 3 at 325). Pirtle argues the last sentence, which was added by the trial judge, invites the jury to convict under a preponderance test because it told the jury it had to have an abiding faith in the falsity of the charge to acquit. We disagree.
Jury instructions, taken in their entirety, must inform the jury that the State bears the burden of proving every essential element of a criminal offense beyond a reasonable doubt. In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072-73, 25 L.Ed.2d 368 (1970); State v. Schulze, 116 Wash.2d 154, 167-68, 804 P.2d 566 (1991); State v. Acosta, 101 Wash.2d 612, 615, 683 P.2d 1069 (1984); State v. McCullum, 98 Wash.2d 484, 494, 656 P.2d 1064 (1983); State v. Green, 94 Wash.2d 216, 224, 616 P.2d 628 (1980). It is reversible error to instruct the jury in a manner that would relieve the State of this burden. State v. Allen, 101 Wash.2d 355, 358, 678 P.2d 798 (1984); State v. Roberts, 88 Wash.2d 337, 340, 562 P.2d 1259 (1977). We review a challenged jury instruction de novo, evaluating it in the context of the instructions as a whole. State v. Brett, 126 Wash.2d 136, 171, 892 P.2d 29 (1995); State v. Benn, 120 Wash.2d 631, 654-55, 845 P.2d 289, cert. denied, ___ U.S. ___, 114 S.Ct. 382, 126 L.Ed.2d 331 (1993).
In his argument, Pirtle relies heavily on Victor v. Nebraska, ___ U.S.___, 114 S.Ct. *262 1239, 127 L.Ed.2d 583 (1994), which considered two jury instructions defining reasonable doubt. Pirtle refers to the California instruction in that case defining reasonable doubt as "that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge." (Emphasis added.) Victor, ___ U.S. at ___, 114 S.Ct. at 1244, 127 L.Ed.2d at 592. The Court upheld this instruction because it explicitly told the jurors their conclusion had to be based on the evidence in the case. "Accordingly, there is no reasonable likelihood that the jury would have understood moral certainty to be disassociated from the evidence in the case." Victor, ___ U.S. at ___, 114 S.Ct. at 1248, 127 L.Ed.2d at 597.
Victor is of no help to Pirtle. The structure of instruction 3 parallels that of the challenged instruction in that case. As in Victor, there is no reasonable likelihood the jury would have understood this instruction to have disassociated the determination whether there was reasonable doubt from the evidence in the case. Four times in instruction 3, the determination whether there was reasonable doubt is linked to the evidence in the case, as indicated in the italicized portions of the instruction:
A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly and carefully considering all of the evidence or lack of evidence. If, after such consideration[,] you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt. If, after such consideration [,] you do not have an abiding belief in the truth of the charge, you are not satisfied beyond a reasonable doubt.
(Emphasis added.) Instruction 3 (Clerk's Papers, vol. 3 at 325).
Moreover, as the State argues, the Court in Victor upheld reference to "abiding belief" in a reasonable doubt instruction. The Court held "[a]n instruction cast in terms of an abiding conviction as to guilt, without reference to moral certainty, correctly states the government's burden of proof." Victor, ___, U.S. at ___, 114 S.Ct. at 1247, 127 L.Ed.2d at 596. See also State v. Mabry, 51 Wash. App. 24, 25, 751 P.2d 882 (1988) (upholding Washington Practice vol. II, Washington Pattern Jury Instructions: Criminal § 4.01 at 65 (2d ed. 1994) (hereinafter WPIC) and holding the State's burden of proof was not misstated by an instruction that the jury is satisfied beyond a reasonable doubt if it has an "abiding belief" in the truth of the charge against the defendant).
Without the last sentence, the jury instruction here follows WPIC 4.01, which previously has passed constitutional muster. The addition of the last sentence does not diminish the definition of reasonable doubt given in the first two sentences, but neither does it add anything of substance to WPIC 4.01. WPIC 4.01 adequately defines reasonable doubt. Addition of the last sentence was unnecessary but was not an error.
6. Failure to instruct on felony murder.
Pirtle argues the trial court erred in refusing a jury instruction on first degree felony murder as requested by defense counsel. This result would require we overrule State v. Irizarry, 111 Wash.2d 591, 592-96, 763 P.2d 432 (1988), and we decline to do so.
To receive a jury instruction on a lesser included offense, each element of the lesser offense must be necessarily included in the charged offense and the evidence must be sufficient to support an inference that the lesser crime was committed. State v. Speece, 115 Wash.2d 360, 362, 798 P.2d 294 (1990); State v. Fowler, 114 Wash.2d 59, 67, 785 P.2d 808 (1990).
In Irizarry, we held first degree felony murder is not a lesser included offense of aggravated first degree murder. Our holding was based on the rationale that the statutory aggravating circumstances are "aggravation of penalty" factors, not "elements" of the crime as such, so commission of a felony is not a necessary element of first degree aggravated murder. Irizarry, 111 Wash.2d at 593-95, 763 P.2d 432.
*263 Pirtle argues aggravating circumstances should be treated as elements of aggravated first degree murder because they must be proved beyond a reasonable doubt during the guilt phase of trial for the Defendant to be convicted of aggravated first degree murder. He maintains Irizarry thus is inconsistent with Green, 94 Wash.2d at 219, 616 P.2d 628, which refers to aggravating circumstances as elements of aggravated first degree murder. If statutory aggravating circumstances are not elements of the crime, Pirtle argues, they are circumstances related to the imposition of an aggravated sentence, which blurs the distinction between the guilt phase and sentencing phase in a capital proceeding, effectively converting the guilt phase into an extended penalty phase.
If there is a logical difficulty in treating statutory aggravating circumstances as something other than elements of aggravated first degree murder, the difficulty is alleviated by the structure of RCW 10.95. To define first degree murder, RCW 10.95.020 refers specifically to the definition of premeditated first degree murder in RCW 9A.32.030(1)(a), indicating the Legislature's intent to incorporate those elements into the definition of aggravated first degree murder. In contrast, the Legislature did not simply refer to RCW 9A.32.030(1)(c) to define the aggravating circumstance of first degree felony murder. Rather, the Legislature separately defined the elements of the "felony murder" aggravating factor. Former RCW 10.95.020(9). The two statutory provisions are not identical, treating second degree arson, kidnapping, and burglary differently. This suggests the Legislature did not intend simply to import first degree felony murder as an aggravating factor under RCW 10.95.020.
Pirtle also contends Irizarry, by distinguishing statutory aggravating circumstances from elements of the crime, unconstitutionally precludes the jury from considering any lesser included instruction, in conflict with Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). Beck is inapposite; it invalidated an Alabama statute that by its terms precluded consideration by the jury of any lesser included offenses. Beck, 447 U.S. at 628-29, 100 S.Ct. at 2385. RCW 10.95 does not preclude consideration of lesser included offenses, and, in fact, the jury here was instructed on the lesser included offense of second degree murder.
First degree felony murder is not a lesser included offense of aggravated first degree murder. Therefore, Pirtle was not entitled to a jury instruction on that crime.
7. Constitutionality of the statutory aggravating factors.
In his pro se brief, Pirtle argues the aggravating factors "intent to conceal" and "common scheme or plan" are unconstitutionally vague. He notes we have previously rejected this argument in State v. Jeffries, 105 Wash.2d 398, 420, 717 P.2d 722, cert. denied, 479 U.S. 922, 107 S.Ct. 328, 93 L.Ed.2d 301 (1986) and asks us to reconsider. We decline.
The special verdict form used in the guilt phase of this case asked the jury the following questions:
QUESTION: Has the state proven the existence of the following aggravating circumstance beyond a reasonable doubt?
CIRCUMSTANCE: The defendant committed the murder to conceal the commission of a crime or to protect or conceal the identity of any person committing a crime.
....
CIRCUMSTANCE: There was more than one person murdered and the murders were part of a common scheme or plan.
Clerk's Papers, vol. 3 at 380, 383. Defendant alleges the concealment circumstance is vague in two respects: first, it does not specify what crime must be concealed, and second, no mental state is required.
The Jeffries court directly addressed both of these contentions. Analogizing to burglary, the court held the Legislature had not required that a specific crime be proven. Jeffries, 105 Wash.2d at 419, 717 P.2d 722. It noted that, in the context of the case, it was obvious the murders were committed so the defendant could steal the victims' property.
*264 There is somewhat more ambiguity in the context of this case, in that a juror could believe both murders were committed to conceal the fact the Defendant had committed a robbery or the second murder was committed to conceal both the robbery and the first murder. In fact, the jury's failure to answer yes to this circumstance with regard to Dawnya indicates it believed the first murder was not motivated by desire to conceal, but presumably revenge, while the second murder was motivated by a desire to conceal.
The fact two crimes were involved here illustrates why the question is phrased in general terms. Murdering to conceal either robbery or murder is an aggravating circumstance. The general question allowed the jury to listen to the evidence and choose between two plausible theories with regard to aggravating circumstances.
The Defendant also contends a separate mental state must be specified for each aggravating circumstance, including concealment. This argument is without merit because most aggravating circumstances are just thatcircumstances, and no mental state is appropriate, e.g., in the course of a robbery. The concealment aggravator, on the other hand, already requires intent. The question asks whether the Defendant did the murder in question to conceal another crime. The wording implies purposefulness, and it is difficult to believe a juror could interpret it otherwise. The Defendant has given us no reason to reexamine Jeffries.
The Defendant also alleges the common scheme or plan aggravator is vague. Under this aggravator, multiple murders are required. We have previously defined the aggravator as requiring a "nexus between the killings." State v. Dictado, 102 Wash.2d 277, 285, 687 P.2d 172 (1984) (citing State v. Grisby, 97 Wash.2d 493, 501, 647 P.2d 6 (1982), cert. denied, 459 U.S. 1211, 103 S.Ct. 1205, 75 L.Ed.2d 446 (1983)).
The use of common scheme or plan in Dictado and Grisby is consistent with the traditional understanding of common scheme or plan within the rules of evidence. This understanding, in turn, sheds light on the nature of the connection needed between the murders. Under the rules of evidence, common scheme or plan may refer to the situation where "several crimes constitute constituent parts of a plan in which each crime is but a piece of the larger plan." State v. Lough, 125 Wash.2d 847, 855, 889 P.2d 487 (1995). The term refers to a larger criminal design, of which the charged crime is only part. State v. Bowen, 48 Wash.App. 187, 192, 738 P.2d 316 (1987).
Thus, the common scheme or plan aggravator requires the killings be connected by a larger criminal plan. In Dictado, the killings were in furtherance of a gambling scheme. Dictado, 102 Wash.2d at 281, 687 P.2d 172. In Grisby, there were multiple killings in revenge for being sold bad quality drugs. Grisby, 97 Wash.2d at 496, 647 P.2d 6.
This definition also comports with the common sense understanding of common scheme or plan. State v. Guloy, 104 Wash.2d 412, 417, 705 P.2d 1182 (1985), cert. denied, 475 U.S. 1020, 106 S.Ct. 1208, 89 L.Ed.2d 321 (1986). The jury instructions and verdict forms are not vague if they can be understood by an average person. See State v. Ng, 110 Wash.2d 32, 44-45, 750 P.2d 632 (1988). For these reasons, we find common scheme or plan is not unconstitutionally vague.
8. Sufficiency of the evidence of the aggravators.
Pirtle contends that, even if the two aggravators discussed above are not vague, there was insufficient evidence to support the jury's finding of common scheme or plan. He also maintains the jury rendered inconsistent verdicts as to these two factors because there was insufficient evidence as to both.
Using the definition of common scheme or plan as an overarching criminal purpose which connects both murders, we reject Pirtle's argument. The State's theory of common scheme or plan here is that Pirtle planned a robbery and killing in revenge for his firing by Burger King. This theory would require sufficient evidence of a plan to rob and to kill and the motivation.
*265 Pirtle himself testified he planned to rob the Burger King. The evidence of the plan to kill was previously detailed in the discussion of premeditation. There was testimony from at least three co-workers supporting the theory of motive. Two were supervisors involved in the decision to fire him. A third testified Pirtle had threatened, "They'll see," just a few days before the crimes.
Pirtle contends there must be evidence of a plan to commit multiple murders. This argument misconstrues common scheme or plan. There does not need to be a plan to kill two or more people or to kill named people. What is needed is a plan that connects the killings.
This same misunderstanding underlies Pirtle's argument that the verdicts with regard to concealment are inconsistent because the jury found concealment as an aggravator only with regard to Tod, while it found robbery and common scheme or plan were aggravators in both murders. These verdicts are easily reconciled if one assumes the jury found Pirtle planned from the beginning to rob the Burger King and to kill Dawnya, and when he found out Tod was also working, he decided to kill him to conceal the other crime. Common scheme or plan does not require both murders be committed for precisely the same reasons, but only that the murders are connected by a larger criminal purpose. Here, as previously discussed, there was ample evidence of that purpose.

Sentencing Phase Issues
The death penalty differs qualitatively from all other punishments, and therefore requires a correspondingly high level of reliability. Johnson v. Mississippi, 486 U.S. 578, 584, 108 S.Ct. 1981, 1985-86, 100 L.Ed.2d 575 (1988); State v. Bartholomew, 101 Wash.2d 631, 637-38, 683 P.2d 1079 (1984) (Bartholomew II). For this reason, we subject capital sentencing determinations to a high level of scrutiny. State v. Lord, 117 Wash.2d 829, 888, 822 P.2d 177 (1991) (Lord I), cert. denied, ___ U.S. ___, 113 S.Ct. 164, 121 L.Ed.2d 112 (1992). Heightened scrutiny does not change the standard of review, but requires more careful review. Lord I, 117 Wash.2d at 888, 822 P.2d 177. We are required to look at the record to determine whether improper procedures or argument caused bias against the defendant or otherwise lessened the reliability of the jury's sentencing determination. Caldwell v. Mississippi, 472 U.S. 320, 330, 105 S.Ct. 2633, 2640, 86 L.Ed.2d 231 (1985).
9. Admissibility of juvenile offenses.
Pirtle argues the court should not have admitted his record of juvenile offenses, which were offered by the State to establish Pirtle's criminal history under RCW 10.95.070(1). We hold to the contrary.
Pirtle contends that because evidence of juvenile offenses cannot be used for determining sentences in noncapital cases, it cannot be admitted in the sentencing phase of a capital trial. He bases his argument on the language in the Sentencing Reform Act of 1981 (SRA) which defines the "criminal history" that may be considered in imposing a sentence:
"Criminal history" shall always include juvenile convictions for sex offenses and shall also include a defendant's other prior convictions in juvenile court if: (i) The conviction was for an offense which is a felony or a serious traffic offense and is criminal history as defined in RCW 13.40.020(9); (ii) the defendant was fifteen years of age or older at the time the offense was committed; and (iii) with respect to prior juvenile class B and C felonies or serious traffic offenses, the defendant was less than twenty-three years of age at the time the offense for which he or she is being sentenced was committed.
Former RCW 9.94A.030(12)(b).
Pirtle is incorrect, however, in asserting juvenile adjudications for misdemeanors and felonies committed before the age of 15 cannot be considered in sentencing in noncapital cases. In State v. McAlpin, 108 Wash.2d 458, 740 P.2d 824 (1987), we held that although felonies committed before the age of 15 are excluded from "criminal history" as used in the SRA for the purpose of computing the presumptive range, such felonies can be used to support an exceptional sentence. Excluding these convictions entirely, *266 we reasoned, "would operate to erase from the record the true circumstances of an offender's past.... Society is entitled to view the long-term repeater of crimes from an early age as a greater threat and as requiring longer institutional supervision than one whose criminal proclivities are not as deeply ingrained." McAlpin, 108 Wash.2d at 464, 740 P.2d 824. Additionally, although McAlpin does not specifically hold juvenile misdemeanor convictions may be used to support an exceptional sentence, its rationale certainly supports the position that such a use is allowed.
Moreover, at least two Court of Appeals cases have held misdemeanor convictions can be used to support an exceptional sentence, although neither addressed the issue of juvenile misdemeanor convictions. See State v. Ratliff, 46 Wash.App. 325, 730 P.2d 716 (1986), review denied, 108 Wash.2d 1002 (1987); State v. Roberts, 55 Wash.App. 573, 779 P.2d 732, review denied, 113 Wash.2d 1026, 782 P.2d 1069 (1989).
Even if juvenile misdemeanor convictions and convictions for felonies committed before the age of 15 can be used in sentencing in noncapital cases, however, this fact does not resolve the issue of whether they can be considered in the penalty phase of a capital case. As the United States Supreme Court has repeatedly pointed out:
[Because] the penalty of death is qualitatively different from a sentence of imprisonment, however long ... there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.
Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976). We have also endorsed the proposition that both the state and federal constitutions mandate a greater level of procedural safeguards surrounding the death penalty than is required in noncapital cases. See, e.g., Bartholomew II, 101 Wash.2d at 640, 683 P.2d 1079.
RCW 10.95.060(3) provides: "The court shall admit any relevant evidence which it deems to have probative value...." RCW 10.95.070 provides that in deciding whether leniency is merited, the sentencer may consider any relevant factors, including but not limited to the following:
(1) Whether the defendant has or does not have a significant history, either as a juvenile or an adult, of prior criminal activity
....
This very broad language of the statute is subject to constitutional limits. In Bartholomew II, we found the statutory mandates under RCW 10.95.060(3) to admit "any relevant evidence" during the special sentencing proceeding, and under RCW 10.95.070 for the jury to consider "any relevant factors" must be limited to mitigating factors. Bartholomew II, 101 Wash.2d at 642, 683 P.2d 1079. Aggravating factors, and the evidence admitted to support them, on the other hand,
must be restricted to meet the evidentiary, and state and federal constitutional standards we have articulated. Specifically, evidence of nonstatutory aggravating factors must be limited to defendant's criminal record, evidence that would have been admissible at the guilt phase, and evidence to rebut matters raised in mitigation by the defendant.
Bartholomew II, 101 Wash.2d at 642, 683 P.2d 1079. We must now determine whether "the defendant's criminal record" includes the juvenile convictions at issue here.
In Lord I, 117 Wash.2d at 897, 822 P.2d 177, and In re Lord, 123 Wash.2d 296, 322, 868 P.2d 835 (1994) (Lord II), cert. denied, ___ U.S. ___, 115 S.Ct. 146, 130 L.Ed.2d 86 (1994), we allowed the admission of evidence of Lord's conviction for second degree murder at age fourteen. Although Lord did not argue the admission of convictions for felonies committed at age 14 is per se unconstitutional, and we therefore did not specifically address that issue, we implicitly approved the use of such evidence in the penalty phase of a capital trial. Lord I, 117 Wash.2d at 896-97, 822 P.2d 177; Lord II, 123 Wash.2d at 320-22, 868 P.2d 835.
The Defendant argues the plurality opinion in Thompson v. Oklahoma, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988), *267 which stated the death penalty cannot be imposed on those who were 15 or younger at the time of the offense, supports the notion that the convictions for acts committed before the age of 15 cannot be considered as an aggravating factor in a capital sentencing proceeding. This argument is not persuasive. To argue that because a criminal act committed at the age of 15 or younger cannot support a death sentence, it cannot be used as an aggravating circumstance in support of a death sentence in a later trial is essentially the same as arguing that because a defendant cannot be sentenced to death for the crime of burglary, a burglary conviction cannot be used as criminal history in a later capital trial. We hold that juvenile convictions for both misdemeanors and felonies may be admitted as nonstatutory aggravating evidence in the sentencing phase of a capital trial.
10. Admissibility of the Montana assault plea.
A. Admissibility of the plea
Pirtle argues the trial court erred in admitting, over defense counsel's objection, his plea of guilty to a Montana assault. He maintains a plea of guilty in response to which a judgment and sentence had not yet been entered is not a conviction under Bartholomew. We disagree.
Whether a guilty plea is admissible at a capital sentencing proceeding turns on whether the plea is admissible under the limiting construction of RCW 10.95.070 this court imposed in Bartholomew.
To allow the jury which has convicted defendant of aggravated first degree murder to consider evidence of other crimes of which defendant has not been convicted is ... unreasonably prejudicial to defendant.... In effect, to allow such evidence is to impose upon a defendant who stands in peril of his life the burden of defending, before the jury that has already convicted him, new charges of criminal activity. Information relating to defendant's criminal past should therefore be limited to his record of convictions.
Bartholomew II, 101 Wash.2d at 641, 683 P.2d 1079 (quoting State v. Bartholomew, 98 Wash.2d 173, 196-97, 654 P.2d 1170 (1982) (Bartholomew II), State's cert. granted and remanded 463 U.S. 1203, 103 S.Ct. 3530, 77 L.Ed.2d 1383, defendant's cert. denied, 463 U.S. 1212, 103 S.Ct. 3548, 77 L.Ed.2d 1395 (1983)).
Pirtle argues the definition of "conviction" in the Montana criminal code should control. Mont.Code Ann. § 45-2-101(15) (1993) defines conviction as
a judgment of conviction or sentence entered upon a plea of guilty or upon a verdict or finding of guilty of an offense rendered by a legally constituted jury or by a court of competent jurisdiction authorized to try the case without a jury.

See also State v. Fisher, 190 Mont. 295, 620 P.2d 1215, 1217 (1980) (interpreting the word "convicted" in the nondangerous offender provision in the criminal code consistently with the above statutory definition).
The fact that a guilty plea is not technically a conviction under Montana law for the purposes of applying the nondangerous offender sentencing statute in that state does not dispose of the question whether the plea should be treated as an adjudication of guilt for the purpose of Bartholomew`s prohibition on the introduction of unadjudicated crimes. Neither does the fact a plea is not treated as a conviction under Washington law in some contexts because the word "conviction" may have "different meanings in different contexts." Tembruell v. Seattle, 64 Wash.2d 503, 508, 392 P.2d 453 (1964).
To resolve this issue, we look instead to Bartholomew itself. A careful reading of the case indicates the court was not distinguishing between "convictions" and other adjudications of guilt, but rather between adjudications of guilt, which may be admitted, and mere allegations or charges not resulting in convictions, which are not. See Bartholomew II, 101 Wash.2d at 641, 683 P.2d 1079 (citing Bartholomew I, 98 Wash.2d at 196-97, 654 P.2d 1170). See also Williams v. Lynaugh, 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 270 (1987), in which Justice Marshall, dissenting, also interprets Bartholomew *268 as differentiating between adjudicated and unadjudicated offenses.
This reading of Bartholomew was expressly confirmed in Lord II, 123 Wash.2d at 320-22, 868 P.2d 835. There, this court considered whether a juvenile adjudication should be excluded under Bartholomew because it was not technically a conviction. The court held the evidence admissible, reasoning that whether the adjudication was technically a "conviction" was not dispositive. The court explained the issue in Bartholomew had been whether the defendant's criminal history included alleged criminal conduct for which he had never been charged or convicted. The court explained that "[a]lthough we used the word `convictions,' it was meant only to distinguish allegations of criminal activity from adjudications of guilt...." Lord II, 123 Wash.2d at 322, 868 P.2d 835.
Accordingly, the fact a plea is not always treated as a conviction under Washington law does not decide the question whether it should be treated as such for the purposes of applying RCW 10.95.070 as interpreted by Bartholomew. The dispositive inquiry would appear to be whether the court will deem a guilty plea sufficiently reliable to warrant admission.
Pirtle does not assert he was ignorant of his rights, improperly influenced to enter the plea, or entered it under any misapprehension. Nor does he assert he has ever sought to withdraw the plea. Under these circumstances, the fact it is theoretically possible to withdraw a plea in Montana before a judgment is entered does not cast doubt upon its reliability in this case.
B. Prejudice from use of the information
Pirtle argues that even if it was not reversible error to admit his plea of guilty for assault, the trial court nevertheless erred in permitting the State to introduce evidence about the circumstances of that offense which were unduly prejudicial. The State introduced the plea by information and minute entry. The information alleged that the felony assault had been accomplished by use of "a weapon, namely, a glass, by hitting Chris Mabrey in the face with the glass causing severe lacerations to his face...." State's Ex. 191.
This court has twice considered the scope of prior criminal history admitted under RCW 10.95.070(1). See Bartholomew II, 101 Wash.2d at 642-43, 683 P.2d 1079; Lord I, 117 Wash.2d at 889-90, 822 P.2d 177. However, neither case is directly on point. In the first case, the issue was admissibility of misconduct for which the defendant had not been convicted. In the second, the issue was scope of rebuttal testimony. Here, in contrast, this court is faced with the question of exactly how much data about a prior conviction is admissible in the State's penalty phase case.
The central issue here is whether the additional facts contained in the information caused undue prejudice to the Defendant. Unlike Bartholomew, here there is no question about reliability. It is difficult to see how an information setting forth the name and elements of a charged crime is inherently more prejudicial to the Defendant than the judgment and sentence normally admitted, provided of course the Defendant was convicted or pleaded guilty to the charged crime.
In fact, an information may have more probative value as the defendant's criminal history when there are alternative means of committing the same crime, because it shows what means were actually used by the defendant. Assault, the crime at issue here, can be committed in a number of different ways. The information here did little more than to inform the jury that this assault resulted in substantial bodily harm and involved the use of a deadly weapon.
Bartholomew does not prohibit the introduction of this information, which simply stated the particular elements of the crime which was the basis for the conviction.
11. Dawnya Calbreath's death penalty essay.
Pirtle argues the trial court erred in refusing to admit an essay written by Dawnya Calbreath expressing her opposition to the *269 death penalty.[4] He maintains the essay was admissible both as mitigating evidence and as a victim impact statement under RCW 7.69.030(14). Both arguments fail.
A defendant may introduce evidence of mitigating circumstances which might merit leniency and evidence "concerning the facts and circumstances of the murder" at the special sentencing proceeding. RCW 10.95.060(3); Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978). Dawnya's essay on the death penalty does not qualify as mitigating evidence. Despite Pirtle's assertions to the contrary, "mitigating evidence" is not defined as any evidence, regardless of its content or relevance, that would disincline the jury to impose the penalty of death. Mitigating evidence is that which "in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability". State v. Bartholomew, 101 Wash.2d 631, 647, 683 P.2d 1079 (1984) (Bartholomew II) (quoting Black's Law Dictionary 903 (5th rev. ed. 1979)). Dawnya's essay has nothing to do with any extenuating circumstance and it has no bearing whatsoever on Pirtle's moral culpability. Neither does Dawnya's essay fall within any of the statutory mitigating circumstances listed in RCW 10.95.070. Her essay does not concern the facts and circumstances of the murder, which would make it admissible under the second category in RCW 10.95.060(3).
Nor does Dawnya's statement qualify as victim impact testimony. The Eighth Amendment prohibits the introduction of victim evidence and argument relating to the characterizations of the crime, the defendant, and the appropriate punishment. Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), overruled in part on other grounds by Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). In overruling Booth, the Payne court explicitly retained the Eighth Amendment proscription against the introduction of victim evidence and argument concerning the crime and the appropriate sentence. Payne, 501 U.S. at 830 n. 2, 111 S.Ct. at 2611 n. 2. Because Dawnya's statement concerned the appropriate sentence to be imposed on the Defendant, it was properly excluded by the trial court.
12. Prosecutorial misconduct.
Arguing pro se, Pirtle asserts three prosecutorial errors at sentencing allegedly denying his right to a fair trial. Each of Pirtle's arguments fails.
To prevail on this argument, the defendant must establish both improper conduct by the prosecutor and prejudicial effect. State v. Furman, 122 Wash.2d 440, 455, 858 P.2d 1092 (1993). Prejudice is established only if there is a substantial likelihood the instances of misconduct affected the jury's verdict. State v. Evans, 96 Wash.2d 1, 5, 633 P.2d 83 (1981).
Pirtle first argues the prosecutor misstated the law by insisting the jury could consider mitigating circumstances only as they related to the crime itself, thereby skewing the sentencing proceedings in violation of the Eighth and Fourteenth Amendments. This argument must be rejected after the United States Supreme Court's decision in Tuilaepa v. California, ___ U.S. ___, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994). In Tuilaepa, two defendants were sentenced to death, one for a murder committed during a robbery and the other for a murder committed during a rape and burglary and involving torture. Tuilaepa, ___ U.S. at ___-___, 114 S.Ct. at 2634-35, 129 L.Ed.2d at 758-59. Both defendants challenged a jury instruction, based on statutory language, that required the jury to consider "the circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true". Tuilaepa, ___ U.S. at ___, 114 S.Ct. at 2637, 129 L.Ed.2d at 762 (quoting 47 *270 Cal.Penal Code § 190.3(a) at 437 (West 1988)). "Special circumstances" in California are the same as "aggravating factors" in Washington. The Court upheld the language:
[O]ur capital jurisprudence has established that the sentencer should consider the circumstances of the crime in deciding whether to impose the death penalty.... We would be hard pressed to invalidate a jury instruction that implements what we have said the law requires.... The circumstances of the crime are a traditional subject for consideration by the sentencer, and an instruction to consider the circumstances is neither vague nor otherwise improper under our Eighth Amendment jurisprudence.
(Citation omitted.) Tuilaepa, ___ U.S. at ___, 114 S.Ct. at 2637, 129 L.Ed.2d at 762.
The prosecutor here correctly stated the law and was well within the bounds of Tuilaepa. The prosecutor's argument that the jury should keep in mind the crime when considering the mitigating circumstances does not convert the sentencing proceeding into an impermissible weighing of mitigating circumstances against unconstitutionally vague aggravating factors. Pirtle has not identified a constitutional error.
Pirtle next argues the prosecutor's repeated description of the crime as "heinous," "savage," and "brutal" exhorted the jury to apply an aggravating factor condemned in Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). In Maynard, the Court held a statutory aggravating factor"especially heinous, atrocious, or cruel"to be unconstitutionally vague, in violation of the Eighth Amendment. Maynard 486 U.S. at 363-65, 108 S.Ct. at 1858-60. Pirtle contends the prosecutor's use of certain terms impermissibly argued to the jury that the heinous nature of the crime was sufficient to impose the death penalty, contrary to Maynard.
Pirtle's reliance on Maynard is misplaced. Maynard addresses cruelty as a statutory aggravating factor. Washington has no such aggravator. The issue here is the use of an adjective to describe the crime. The fact that adjective was also used to describe the improper aggravator is irrelevant. See Arave v. Creech, ___ U.S. ___, ___, 113 S.Ct. 1534, 1541, 123 L.Ed.2d 188, 199 (1993) (distinguishing adjectives that describe a particular crime in a particular case from those in a statute describing a crime as a whole). Moreover, in this case the relevant jury instruction given by the trial court clearly listed the aggravating factors the jury was permitted to consider:
The defendant committed the murder to conceal the commission of a crime or to protect or conceal the identity of any person committing a crime, or
There was more than one person murdered and the murders were part of a common scheme or plan, or
The murder was committed in the course of, in furtherance of, or in immediate flight from robbery.
Instruction 19 (Clerk's Papers, vol. 3 at 341). Nothing in this instruction or any other given to the jury could have led the jury to believe the heinous nature of the crime itself was sufficient to impose the death penalty. See Tuilaepa, ___ U.S. at ___, 114 S.Ct. at 2636, 129 L.Ed.2d at 761 (for a sentencing factor to be unconstitutionally vague, it must do more than simply "point[ ] the sentencer to a subject matter"; it must be presented so the sentencer has to find it true or false). Pirtle's attempt to pick out certain words from the prosecutor's argument and weave them into a violation of Maynard fails on the record before this court.
Finally, Pirtle contends the prosecutor impermissibly appealed to the jury's sympathy for the victims' relatives during the sentencing phase. Pirtle does not indicate how this appeal was made and our review of the prosecutor's arguments during the sentencing phase reveals only a single reference to the victims' relatives:
Mr. Rodgers [Pirtle's counsel] was correct when he stated that nothing can bring Tod and Dawnya back. Nobody knows that better than the family of Tod and Dawnya, but that's not the question. The question is whether this defendant, who created the reason that they will never be brought back, that all they were and *271 all they ever could be or ever might be disappeared because of this defendant, and whether or not this defendant possesses in connection with the crimes that he committed justification for leniency....
Report of Proceedings, vol. 17 at 3044-45. While this reference to the victims' families might be characterized as an appeal to the jury's sympathy for the victims' relatives, we cannot conclude it swayed the jury in any way given the nature of the crimes involved, the vivid testimony and evidence received at trial, and the fact that the victims' families sat in the first two rows of the gallery, in close proximity to the jury, throughout the trial.
13. Antisympathy jury instruction.
Instruction 1 of the penalty proceeding states in part:
You should bear in mind that your verdict must be based on reason and not upon emotion. Throughout your deliberations you must not be influenced by passion, prejudice or sympathy. You may find mercy for the defendant to be a mitigating circumstance.
Report of Proceedings, vol. 17 at 2995. The last two paragraphs of instruction 4 state:
A mitigating circumstance is a fact about either the offense or about the defendant which in fairness or in mercy may be considered as extenuating or reducing the degree of moral culpability or which justifies a sentence of less than death, although it does not justify or excuse the offense.
The appropriateness of the exercise of mercy is itself a mitigating factor you may consider in determining whether the State has proved beyond a reasonable doubt that the death penalty is warranted.
Report of Proceedings, vol. 17 at 2997.
Pirtle contends the antisympathy instruction is itself unconstitutional and that the antisympathy instruction is irreconcilable with the mercy instruction. We reject both contentions.
As a threshold matter, we must decide whether to consider this assignment of error. The State maintains that because the Defendant did not except to this instruction, he cannot raise the issue on appeal. RAP 2.5(a), however, allows parties to raise certain claims of error for the first time on appeal, including "manifest error affecting a constitutional right." As we noted in State v. Scott, 110 Wash.2d 682, 757 P.2d 492 (1988):
Constitutional errors are treated specially because they often result in serious injustice to the accused. Such errors also require appellate court attention because they may adversely affect the public's perception of the fairness and integrity of judicial proceedings.
(Citations omitted.) Scott, 110 Wash.2d at 686-87, 757 P.2d 492.
We have recognized these considerations are even more important in a capital case:
None of the instructions defendant now argues should have been given were proposed at trial as they must have been to preserve any claimed error, and no exceptions were taken to those instructions which were given as is necessary to preserve any claimed error as to them. This being a capital case, and since some of the arguments allege constitutional error, we have nonetheless reviewed these claims.
State v. Mak, 105 Wash.2d 692, 749, 718 P.2d 407, cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986), sentence vacated on writ of habeas corpus sub nom. Mak v. Blodgett, 754 F.Supp. 1490 (W.D.Wash.1991), aff'd, 970 F.2d 614 (9th Cir.1992), cert. denied, ___ U.S. ___, 113 S.Ct. 1363, 122 L.Ed.2d 742 (1993). Only by reviewing all claims of error affecting a constitutional right, even if raised for the first time on appeal, can this court ensure against the arbitrary infliction of the death penalty.
On the merits, Pirtle's claim is very similar to that made in In re Rupe, 115 Wash.2d 379, 798 P.2d 780 (1990) (Rupe III). In that case, this court held "giving a no-sympathy instruction does not violate the Eighth and Fourteenth amendments." Rupe III, 115 Wash.2d at 390, 798 P.2d 780. The holding was based in large part on the United States Supreme Court's holding in California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987). In Brown, the Supreme Court approved an antisympathy instruction *272 that informed the jurors that during the penalty phase of a capital murder trial, they "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." Brown, 479 U.S. at 539, 107 S.Ct. at 838. The Court reasoned that a reasonable juror would interpret the phrase "mere sympathy" as "an admonition to ignore emotional responses that are not rooted in the aggravating and mitigating evidence introduced during the penalty phase." Brown, 479 U.S. at 542, 107 S.Ct. at 840.
Pirtle contends the rule adopted in Rupe conflicts with the established precedent concerning the proper scope of mitigating evidence, because the Lockett-Eddings line of cases requires the jury have unfettered discretion not to impose death. See Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973 (1978); Eddings v. Oklahoma, 455 U.S. 104, 114, 102 S.Ct. 869, 877, 71 L.Ed.2d 1 (1982), cert. denied, 470 U.S. 1051, 105 S.Ct. 1750, 84 L.Ed.2d 814 (1985). This court specifically rejected this contention in Rupe III, noting it had been rejected by the Supreme Court in Saffle v. Parks, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990). Rupe III, 115 Wash.2d at 386-88, 798 P.2d 780.
Pirtle also argues the instruction to the jury to not let sympathy influence their decision is incompatible with the instructions that mercy for the defendant is a proper mitigating factor. This court addressed this issue in Rupe III. The court distinguished between sympathy, which depends on an emotional response, and mercy, which depends on a "reasoned moral response." Rupe III, 115 Wash.2d at 397, 798 P.2d 780. The court concluded that the instructions properly informed the jury to use mercy and fairness in considering the mitigating factors, but not to let their emotional reactions sway their reason. Rupe III, 115 Wash.2d at 397, 798 P.2d 780.
The Defendant argues the instruction at issue here can be distinguished from those upheld in Rupe III because in that case the words mercy and fairness were linked by an "and" while here the words mercy and fairness were linked by an "or." In context, this is a meaningless difference. Telling the jury they may use mercy and fairness can have no different effect than telling them they may use mercy or fairness.
14. Jury instructions on mitigating circumstances.
Pirtle argues the trial court's use of mitigating circumstances in the plural in the jury instructions precluded jurors from granting leniency based upon a single mitigating factor.[5] We disagree.
Washington's statutory death penalty question asks:
Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?
(Emphasis added.) RCW 10.95.060. This question was read to the jury here as part of instruction 5.
Instruction 3 also dealt with mitigating circumstances:
During this sentencing phase proceeding, the State has the burden of proving to you beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency. If the State meets this burden the death penalty will be imposed. The defendant does not have to prove the existence of any mitigating circumstances or the sufficiency of any mitigating circumstances....
(Emphasis added.) Pirtle contrasts these instructions with instruction 4 which defines "mitigating circumstance" and uses the singular. He argues these instructions made it clear there must be more than a single factor to justify leniency.
The Defendant is correct that if the jury is precluded from giving effect to a single factor, the proceeding is constitutionally flawed. See Mills v. Maryland, 486 U.S. *273 367, 379-80, 108 S.Ct. 1860, 1868, 100 L.Ed.2d 384 (1988). However, this court has previously found the use of the plural does not preclude the jury from considering a single factor. In re Rice, 118 Wash.2d 876, 896, 828 P.2d 1086, cert. denied, ___ U.S. ___, 113 S.Ct. 421, 121 L.Ed.2d 344 (1992).
The result in Rice was sound. Defendant's argument ignores the remainder of instruction 3, which informs the jury there is a presumption of leniency. It ignores the fact instruction 4 informs the jury that mercy is always an appropriate mitigating factor. Individual instructions must be viewed in the context of the instructions as a whole. In re Lord, 123 Wash.2d 296, 323, 868 P.2d 835 (Lord II), cert. denied, ___ U.S. ___, 115 S.Ct. 146, 130 L.Ed.2d 86 (1994). Here the instructions adequately allowed jurors to consider a single mitigating circumstance.
15. Constitutionality of the Washington death penalty statute.
Pirtle argues application of RCW 10.95.060(4) together with RCW 10.95.070(1) and (7) constitutes an impermissible weighing process like that discussed in Stringer v. Black, 503 U.S. 222, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992). Pirtle maintains the jury instructions, argument, and verdict forms in this case demonstrate these provisions are factors that were critical to the jury's decision whether he would live or die. He argues these factors are vague and fail to channel the sentencer's discretion, in contravention of Stringer. We reject this argument.
Pirtle first challenges the statutory question asked of the jury in the sentencing phase: "Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?" RCW 10.95.060(4). He contends the first phrase of this question, "having in mind the crime of which the defendant has been found guilty," effectively instructs on an aggravating factor to be considered in the weighing process, fails to channel jury discretion as required by Stringer, and prevents the jury from considering relevant mitigating evidence.
Similar challenges to the interrogatory in RCW 10.95.060(4) have been considered by this court and rejected. See State v. Gentry, 125 Wash.2d 570, 652-53, 888 P.2d 1105 (1995) (upholding RCW 10.95.060(4) against defendant's claim it was unconstitutionally vague), cert. denied, ___ U.S. ___, 116 S.Ct. 131, ___ L.Ed.2d ___; State v. Benn, 120 Wash.2d 631, 669, 845 P.2d 289 (upholding RCW 10.95.060(4) against defendant's claim it did not channel jury discretion), cert. denied, ___ U.S. ___, 114 S.Ct. 382, 126 L.Ed.2d 331 (1993); State v. Rupe, 108 Wash.2d 734, 755, 743 P.2d 210 (1987) (holding first phrase of question in RCW 10.95.060(4) gives effect to the constitutional requirement that jurors make an individualized determination as to whether the sentence of death should be imposed), cert. denied, 486 U.S. 1061, 108 S.Ct. 2834, 100 L.Ed.2d 934 (1988).
The phrase Pirtle challenges is similar to the one approved by the United States Supreme Court in Tuilaepa v. California, ___ U.S. ___,___, 114 S.Ct. 2630, 2637, 129 L.Ed.2d 750, 762 (1994), which held "[t]he circumstances of the crime are a traditional subject for consideration by the sentencer, and an instruction to consider the circumstances is neither vague nor otherwise improper under our Eighth Amendment jurisprudence." Pirtle's first challenge must fail in light of these cases.
Pirtle next challenges the jury instruction allowing the jury to consider the factors set forth in RCW 10.95.070(1) and (7).[6] The challenged instruction followed the statutory language exactly:
You are also to consider as mitigating circumstances any other factors concerning *274 the offense or the defendant that you find to be relevant, including, but not limited to, the following:
Whether the defendant has or does not have a significant history, either as a juvenile or an adult, of prior criminal activity, or
. . . . .
Whether the age of the defendant at the time of the crime calls for leniency[.]
Instruction 4 (Clerk's Papers, vol. 3 at 317). Pirtle contends the terms "significant history" of "criminal activity" and "age of the defendant" are impermissibly vague under the Eighth Amendment.
The trial court may instruct the jury using the language of RCW 10.95.070. State v. Brett, 126 Wash.2d 136, 194, 892 P.2d 29 (1995) (citing cases). Pirtle unpersuasively argues the challenged instruction allows the jury unchanneled discretion to consider his age and past criminal activity as aggravating factors, contrary to Stringer. Both RCW 10.95.070 and the challenged instruction are explicit: these factors are to be considered in determining whether there are sufficient mitigating circumstances to merit leniency. Pirtle's argument would convert these factors in mitigation into aggravating factors solely because of their alleged vagueness, but they are not unconstitutionally vague. See Tuilaepa, ___ U.S. at ___-___, 114 S.Ct. at 2637, 129 L.Ed.2d at 762-63 (rejecting vagueness challenges to California factors requiring the jury to consider defendant's prior criminal activity and his age at the time of the crime). We find no Eighth Amendment infirmity in the challenged instruction.
16. Constitutionality of the death penalty.
Pirtle argues pro se that the death penalty violates the Eighth and Fourteenth Amendments to the U.S. Constitution and article 1, sections 3 and 14, of the Washington Constitution. He admits, however, this court has upheld the constitutionality of the death penalty in each area involved in this challenge. We decline to reconsider our prior holdings in this area.
Pirtle's due process and equal protection claims were disposed of by State v. Jeffries, 105 Wash.2d 398, 428, 717 P.2d 722, cert. denied, 479 U.S. 922, 107 S.Ct. 328, 93 L.Ed.2d 301 (1986). His cruel and unusual punishment claims were disposed of by State v. Campbell, 103 Wash.2d 1, 35, 691 P.2d 929 (1984), cert. denied, 471 U.S. 1094, 105 S.Ct. 2169, 85 L.Ed.2d 526 (1985).
Pirtle urges us to adopt Justice Blackmun's reasoning in Callins v. Collins, ___ U.S.___, ___-___, 114 S.Ct. 1127, 1127-38, 127 L.Ed.2d 435, 435-49 (1994) (Blackmun, J., dissenting from denial of petition for certiorari). The thrust of Justice Blackmun's dissent is that the death penalty cannot be administered fairly and rationally, leading to inconsistent application of the death penalty. Justice Blackmun's concern is a fair one, and one with which we have wrestled over the years. However, Pirtle gives us no reason to revisit this difficult issue; his argument consists solely of an extended quotation from Justice Blackmun's dissent.

Statutory Review Issues
17. Sufficiency of the evidence.
Pirtle argues there was insufficient evidence to support the jury's verdict of death. We disagree. This statutory review issue requires us to view the evidence in the light most favorable to the prosecution to determine if any rational trier of fact could have found sufficient evidence to support the verdict beyond a reasonable doubt. Brett, 126 Wash.2d at 206, 892 P.2d 29.
Pirtle argues there was the following mitigating evidence: an abusive childhood, substance abuse, impaired intellectual functioning due to substance abuse, a history of nonviolent rather than violent crimes, a tendency to do well in incarceration, and his remorse for the crime. He maintains this evidence was sufficient to merit leniency.
Pirtle's argument ignores the fact the jury must consider these mitigators against the nature of the crime, including the aggravating factors. Here the jury had found two very brutal murders planned and committed to facilitate a robbery, along with revenge. The jury found Pirtle had committed the *275 second murder to conceal his identity as the perpetrator of the robbery and first murder. Given these facts, the jury could well have felt the mitigating factors were insufficient to merit leniency.
18. Proportionality.
As a threshold matter, Pirtle argues that Washington's proportionality review violates due process, citing Harris v. Blodgett, 853 F.Supp. 1239, 1288 (W.D.Wash.1994). This argument has been rejected in Brett, 126 Wash.2d at 207-09, 212, 892 P.2d 29, and the Defendant offers no reason to reexamine the issue. To the extent the Defendant's due process challenge is based on vagueness, we believe our opinion today continues where Brett left off in providing an explicit framework for analysis.
Pirtle contends his death sentence was disproportionate under RCW 10.95.130(2)(b). We find that it was not disproportionate.
RCW 10.95.130(2)(b) provides mandatory review by this court as to:
Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. For the purposes of this subsection, "similar cases" means cases reported in the Washington Reports or Washington Appellate Reports since January 1, 1965, in which the judge or jury considered the imposition of capital punishment regardless of whether it was imposed or executed, and cases in which reports have been filed with the supreme court under RCW 10.95.120....
No question of statutory interpretation has received more careful consideration than what this subsection means and how to best give it effect. We have acknowledged the statute often requires "the comparison of incomparables," Benn, 120 Wash.2d at 679, 845 P.2d 289, and the task is, at times, a "struggle." Brett, 126 Wash.2d at 208, 892 P.2d 29.
Perhaps the best way to understand proportionality review is to examine its historical development. Traditionally, proportionality review analyzed the appropriateness of a sentence for a particular crime. Pulley v. Harris, 465 U.S. 37, 42-43, 104 S.Ct. 871, 875-76, 79 L.Ed.2d 29 (1984). From time to time, the United States Supreme Court would strike down a particular punishment as disproportionate, and therefore cruel and unusual. Pulley, 465 U.S. at 43, 104 S.Ct. at 875-76.
The role of proportionality review changed after Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). In Furman, the court found existing death penalty statutes gave juries so little guidance that the death penalty was being imposed discriminatorily. Furman, 408 U.S. at 240, 92 S.Ct. at 2727 (Douglas, J., concurring). The large numbers of crimes that were death-eligible coupled with unfettered jury discretion had resulted in the death penalty being imposed so infrequently that there was no principled way to distinguish those cases in which death was imposed. Furman, 408 U.S. at 312, 92 S.Ct. at 2763-64 (White, J., concurring). The fact a "random handful" of rapists and murderers were selected for execution from among equally culpable individuals caused one Justice to conclude the death penalty was being imposed "wantonly" and "freakishly." Furman, 408 U.S. at 310, 92 S.Ct. at 2762-63 (Stewart, J., concurring).
Furman required states to focus their death penalty statutes more narrowly so the discretion of the jury was channeled. Gregg v. Georgia, 428 U.S. 153, 189, 96 S.Ct. 2909, 2932-33, 49 L.Ed.2d 859 (1976); see also State v. Bartholomew, 98 Wash.2d 173, 182-83, 654 P.2d 1170 (1982) (Bartholomew I), State's cert. granted and remanded, 463 U.S. 1203, 103 S.Ct. 3530, 77 L.Ed.2d 1383, defendant's cert. denied, 463 U.S. 1212, 103 S.Ct. 3548, 77 L.Ed.2d 1395 (1983). In response, states limited the number of capital crimes, commonly by defining certain aggravating circumstances in which the death penalty would be appropriate. See, e.g., Gregg, 428 U.S. at 161, 96 S.Ct. at 2919; Proffitt v. Florida, 428 U.S. 242, 248 n. 6, 96 S.Ct. 2960, 2965 n. 6, 49 L.Ed.2d 913 (1976). By narrowing the category of death-eligible defendants, legislatures themselves performed the traditional proportionality review of fitting the penalty to the crime.
*276 Many of the states included a provision in their new statutes calling for appellate proportionality review. This review does not question whether the sentence is proportionate to the crime itself, but instead asks whether a particular sentence is disproportionate to the punishment imposed on others convicted of the same crime. Pulley, 465 U.S. at 43, 104 S.Ct. at 875-76; McCleskey v. Kemp, 481 U.S. 279, 306, 107 S.Ct. 1756, 1774-75, 95 L.Ed.2d 262 (1987). This comparative proportionality review serves as an additional safeguard against arbitrary or capricious sentencing. Pulley, 465 U.S. at 45, 104 S.Ct. at 876-77.
Washington's statute incorporates the above scheme. The Legislature has narrowed the number of death-eligible persons from all those convicted of premeditated first degree murder to a smaller subset by specifying aggravating circumstances that may merit a death sentence. The Legislature has, in effect, said these aggravating circumstances render the death penalty proportionate to the crime. Between the time the statute was enacted and oral argument in this case, 145 persons[7] were convicted of aggravated first degree murder and thus were death eligible.
Washington's statutory scheme also allows those charged with aggravated first degree murder to offer mitigating evidence. Prosecutors, after reviewing the evidence, often decide not to seek the death penalty. Of the 145 persons convicted of aggravated first degree murder, only forty-one faced a special sentencing proceeding. Juries also have discretion to consider mitigating factors. Of the forty-one aggravated murderers facing a sentencing jury, only sixteen were sentenced to death.
Thus in performing comparative proportionality review, this court compares the present case against the field of 145 to see whether a particular death sentence is disproportionate. We are required to do more than find cases which never should have been charged with aggravated murder. Those verdicts should fall based on sufficiency of the evidence without ever getting to proportionality. Our task is a comparison of those cases within the aggravated murder pool, including the majority of cases where death is either not sought or not imposed.
In reviewing the cases, we assume they can be arrayed on a rough continuum from least serious to most serious, considering the nature of the crime and any mitigating factors. We also assume prosecutors and juries have acted properly. If that is the case, the sixteen cases resulting in a death penalty represent some combination of the worst crimes and the fewest mitigating factors when compared to the 129 cases which did not result in a death sentence.
In reviewing an individual case, we look for disproportionality. We are not concerned with whether a given crime can be matched with one or more of the fifteen other death penalties. Instead, our job is to weed out those cases in which the crime and the defendant's mitigation most closely match the less serious of the 129 cases which did not result in a death penalty.
In making actual case comparisons, we have adhered closely to the statutory directive to consider "both the crime and the defendant." We have subdivided the crime and the defendant into four factors: the nature of the crime, the aggravating factors, the defendant's prior convictions, and his personal history. Lord I, 117 Wash.2d at 910-14, 822 P.2d 177; Benn, 120 Wash.2d at 680, 845 P.2d 289; Gentry, 125 Wash.2d at 656, 888 P.2d 1105.
The question of which cases to use for comparison has been more vexing. In our first cases under the new statute, we apparently looked only to those cases where the death penalty had been sought. Lord I, 117 Wash.2d at 908, n. 27, 822 P.2d 177. In Rupe, 108 Wash.2d at 767, 743 P.2d 210, we made it clear that all the reported aggravated murder cases were available for comparison. This approach, however, grew somewhat unwieldy as more and more cases were reported. In Lord I, we articulated the "family resemblance approach." This was somewhat easier because it made comparisons *277 against a smaller group of cases that were generally similar. However, the result was dependent on the cases selected. The defendant, the State, and indeed the members of this court often disagreed on which cases formed the "family." In Brett, we returned to the analysis required by the literal words of the statute, making it clear that each case would be compared against all other reported aggravated murders. Brett, 126 Wash.2d at 211, 892 P.2d 29.
Today, we reaffirm our approach in Brett. We look at Pirtle's sentence in light of all aggravated murder sentences to see whether it is "wanton," "freakish," or otherwise disproportionate. Brett, 126 Wash.2d at 211, 892 P.2d 29.
In so doing, we make explicit the comparisons implicit in Brett. We look at the nature of this crime compared to other aggravated murders, at the number of aggravators compared to the others, and at the defendant's criminal and personal history compared to other aggravated murderers'. We have quantified those factors that are easily quantifiable in order to be as objective as possible. By this we do not suggest proportionality is a statistical task or can be reduced to a number, but only that numbers can point to areas of concern. At its heart, proportionality review will always be a subjective judgment as to whether a particular death sentence fairly represents the values inherent in Washington's sentencing scheme for aggravated murder.
Turning to the particular crime at issue, we look first at the number of aggravators three. Of the 145 aggravated murders considered here, 114 involved one or two aggravators. In contrast, there were only thirty-one involving three or more, or just over twenty percent. This crime therefore ranks among the most serious in regard to the number of aggravators.
The nature of the crime also ranks among the most serious, based on the brutal method of killing, the planning involved, and the number of victims. Pirtle beat the victims over the head with paint cans and then cut their necks with a knife or hacksaw. While we cannot say this is the most brutal of the 146 crimes reported, it is worse than most. It also involved a greater degree of premeditation than many. This was a revenge killing, and there was ample evidence of careful preparation by Pirtle. There were also two victims. In approximately two-thirds of the aggravated murders reported, there was a single victim. Therefore this crime again is among the most serious.
Pirtle's criminal history was extensive, including fifteen prior convictions. In only five of 145 aggravated murdersthree percent had the defendant committed more than ten crimes. Again, Pirtle ranks near the top.
Finally, we look at the subjective factors in Pirtle's background. He offered mitigation evidence of drug and alcohol addiction and an abusive family history. The role of mitigation evidence is to reduce culpability for a crime that has already been proved. An examination of the aggravated murder reports shows that some mitigatorsfor instance, mental illness or extreme emotional distressmay lead prosecutors and juries not to seek or impose the death penalty. Neither addiction nor a history of abuse as a child appears to have such an effect. Though both, unfortunately, are commonly cited as mitigation, they appear to have little effect on the outcome.
In short, there is no factor or combination of factors which marks this as an unusual, let alone wanton or freakish, death penalty case. The number of aggravators was high. The nature of the crime was among the most serious. Pirtle's criminal record was one of the very most extensive. His mitigation evidence was, at best, average and does not overcome the other factors.
In each of the twelve death sentences we have upheld under RCW 10.95.130(b), one or more of the four factors set the case apart as a more serious than "average" aggravated murder. Sometimes, a single factorthe thirteen victims in Makovershadowed all others. In other cases, nearly all the factors supported the conclusion the crime was among the most serious aggravated murders. This case belongs to the latter category. Pirtle's crime was extreme and his sentence of death is not a disproportionate penalty.
*278 19. Passion and prejudice.
Pirtle argues that the nature of the crime was the "single most devastating and unlimited aggravating factor." Br. of Appellant at 249. Pirtle accuses the prosecutor of demagogically urging the jury to respond to the crime rather than to the Defendant, resulting in a verdict based on passion or prejudice. We disagree.
Arguments that evoke an emotional response are appropriate so long as they are restricted to the circumstances of the crime. Brett, 126 Wash.2d at 214, 892 P.2d 29. Blake Pirtle, having committed a crime that shocks even the jaded sensibilities of today's citizens, cannot avoid justifiable outrage or claim unfair prejudice when these were generated by his own actions.
We affirm the conviction and the imposition of the death sentence. Because we affirm, we need not reach the State's cross appeal issues.
DOLLIVER, SMITH, GUY, MADSEN, ALEXANDER, TALMADGE and PEKELIS, JJ., concur.
DURHAM, Chief Justice (concurring).
"In virtually every recent death penalty case decided by this court, a different definition of proportionality has been promulgated. The resulting confusion is unacceptable." State v. Brett, 126 Wash.2d 136, 214-15, 892 P.2d 29 (1995) (Durham, C.J., concurring). Once again, the majority feels compelled to tinker with what is perhaps the most over-analyzed area of death penalty review, this time purporting to build upon an analysis which was not adopted by a majority of this court.
In State v. Lord, 117 Wash.2d 829, 822 P.2d 177 (1991), we articulated the "family resemblances" test. This approach determines proportionality by comparing the case under review with similar cases, recognizing that not all cases in which the death penalty has been imposed share a set of particular attributes. Lord 117 Wash.2d at 911, 822 P.2d 177. This approach was followed in State v. Dodd, 120 Wash.2d 1, 838 P.2d 86 (1992), and State v. Gentry, 125 Wash.2d 570, 888 P.2d 1105 (1995). The departures from this approach in State v. Benn, 120 Wash.2d 631, 845 P.2d 289 (1993) and Brett did not garner a majority of votes. As I indicated in my concurrence in Brett, the court's endlessly varying proportionality analysis is itself an obstacle to ensuring proportionality.
NOTES
[1] The Advisory Committee to the Federal Rules of Evidence notes: "While situations will arise which call for the exclusion of evidence offered to prove a point conceded by the opponent, the ruling should be made on the basis of such considerations as waste of time and undue prejudice (see Rule 403), rather than under any general requirement that evidence is admissible only if directed to matters in dispute." Advisory Committee's Note to Fed.R.Evid. 401.
[2] All exhibit numbers used in the discussion of the photographs admitted at trial refer to the State's exhibits.
[3] The State argues the challenged jury instruction was requested by Pirtle, so his challenge should be precluded by the invited error doctrine, which prohibits a party from setting up an error in the trial court then complaining of it on appeal. See, e.g., State v. Henderson, 114 Wash.2d 867, 870, 792 P.2d 514 (1990); State v. Neher, 112 Wash.2d 347, 352-53, 771 P.2d 330 (1989). The error was not invited; the last sentence of the challenged jury instruction, which is the subject of Pirtle's challenge, was not requested by Pirtle but was added by the trial court.
[4] Pirtle views Dawnya's statement as "call[ing] for a sentence of less than death" because it cogently and rationally articulates her opposition to the death penalty. Br. of Appellant at 177. However, as the State notes, Dawnya's statement might not benefit Pirtle as much as he believes because of her equivocation: "I cannot say how I would feel if one of my loved ones was murdered. I hope I would remain with the same position but unfortunately I don't think that is true." Def.'s Ex. 222.
[5] Defendant did not make this argument at trial, although he did except to the mitigating circumstances instruction.
[6] RCW 10.95.070 provides as follows, in relevant part:

"In deciding the question posed by RCW 10.95.060(4), the jury ... may consider any relevant factors, including but not limited to the following:
(1) Whether the defendant has or does not have a significant history, either as a juvenile or an adult, of prior criminal activity;
...
(7) Whether the age of the defendant at the time of the crime calls for leniency[.]"
[7] The numbers we use here reflect reports received through March 9, 1995. There are two reports regarding Mitchell Rupe, but we treat it here as a single case.