FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2016 NOV 14  AM 10: 50



# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | DIVISION ONE |
| Respondent, | ) | |
| | ) | No. 73952-2-I |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| BIJAN KHORRAMI, | ) | |
| Appellant. | ) | FILED: November 14, 2016 |

DWYER, J. — A jury found Bijan Khorrami guilty of assault in the third degree after he drove his car over the arm of a parking enforcement officer who was attempting to boot the car. On appeal, he alleges instructional error and insufficient evidence to support his conviction. But Khorrami proposed the instructions he now seeks to challenge. The invited error doctrine therefore precludes our review. And Khorrami's failure to object to the trial court's answer to a jury inquiry waives the issue for appeal. Because substantial evidence supports his conviction, we affirm.

I

At about 12:30 p.m. on August 27, 2014, Seattle Parking Enforcement Officers (PEO) Arlene Calderon and Nina Nolan were on patrol in a marked parking enforcement van. The van was equipped with license plate recognition cameras and software that automatically scanned license plates to determine if

the vehicles were "boot eligible," i.e., associated with four or more unpaid parking tickets.

Upon discovering a boot eligible vehicle, an officer would place a 16 pound, U-shaped yellow metal "boot" on one of the tires. For safety reasons and to avoid blocking traffic, officers generally attach the boot to one of the curbside tires. The boot effectively immobilizes the vehicle until the owner pays the outstanding fines and receives a code that allows unlocking of the boot.

While the officers were driving north on First Avenue through the Belltown area of Seattle, the license recognition system registered a "hit" on two cars parked outside a flower shop belonging to appellant Bijan Khorrami. Neema Khorrami, Bijan Khorrami's son, was also working at the shop at the time.

One of the cars, a Lexus SUV, belonged to Khorrami and was parked on the same side of the street as the shop and slightly south of the shop's entrance. The second car, a Honda, belonged to Neema's girlfriend, and was parked two to four car lengths north of the Lexus.

Calderon got out of the van and placed a boot on the rear curbside tire of the Honda. She then retrieved a boot to place on the Lexus while Nolan prepared the associated paperwork. Both Calderon and Nolan were wearing parking enforcement badges and fluorescent green reflective vests with the words "SEATTLE POLICE" on the back.

2

Calderon determined that she would boot the front curbside tire of the Lexus because it appeared to be slightly farther away from the curb than the rear tire. Calderon squatted or kneeled down to place the boot over the tire, a process that required her to reach into the wheel well. While she was maneuvering the boot into place, Calderon heard a man, later identified as Khorrami, run by yelling, "don't boot my car." Calderon did not see the man.

A short time later, as she struggled to lock the boot in place, Calderon heard the engine of the Lexus start. Before Calderon could remove her arm from the wheel well, the Lexus abruptly moved a short distance in reverse, pinning her arm under the boot clamp. The car then rolled forward, and Calderon was able to remove her arm.

> When [the boot] started rotating, it started to maneuver down, that's why it clipped my arm in the position and then that's when it started sucking me under because the tire was going over my arm, you know, just like an old washing machine if you put something in there like clothes, that's the same thing that happened to my arm. I started rotating like that because the bar was holding me down and thank goodness it started rolling forward and I was able to pull my arm out.

After freeing her arm, Calderon stood up, banged on the hood of the Lexus, and yelled at the driver, "you just ran over my hand." Khorrami got out of the car, but did not otherwise respond.

Calderon experienced a throbbing, constant pain in her arm after the incident. Doctors were able to relieve the pain with morphine when Calderon was admitted to the hospital. Although no bones were broken, Calderon

3

experienced a substantial reduction in the functionality of her wrist and later underwent surgery to repair some of the damage.

Nolan testified that Khorrami came running toward her while she stood outside the driver's door of the Lexus. Khorrami was agitated and yelled, "Do not boot my car. You cannot boot my car."

> So as he approached me telling me do not boot my vehicle, I said your vehicle has been booted, it's been identified with four or more unpaid parking citations. He kept coming towards me, so he had a key in his hand. I said your vehicle has been booted. He put his shoulder into my left side and started trying to push towards the driver's door, because I was right at his driver's door. I said do not get in your vehicle. He said my car is not parked. He said my car is not parked. The rest was a short little sentence like I'm going to be driving my vehicle or it was nonsense. He was in a state of maybe panic, I'm not sure.

Khorrami's Lexus had been booted on at least eight previous occasions. Khorrami acknowledged that he was familiar with the boot process and the procedure for unlocking the boot. Khorrami had most recently paid to have the boot removed 12 days before the charged incident. He explained that he routinely received traffic tickets while delivering flowers and that it was sometimes more efficient to wait until his car was booted before paying all outstanding citations at once.

Khorrami testified that he was in his shop preparing delivery route lists that he and Neema would use that afternoon when an employee said that Neema's car was being booted. Neema was using his girlfriend's car for deliveries that day, and Khorrami knew that Neema was going to get "upset." As Khorrami ran

4

out of the shop, he saw that PEO Nolan was handing Neema "the paperwork" and that Neema's car was already booted. Khorrami walked directly over to Neema, asked for the paperwork, and told Neema, "it's alright, I'll get it off, I know how to do that, it doesn't take that long."

After Neema had calmed down, Khorrami turned to walk back to the shop and saw Nolan standing near the front of his Lexus. Khorrami stated that he walked directly over to Nolan and asked, "are you trying to boot my car too?" Nolan replied, "Yes, you are boot eligible also and we are going to boot your car."

Khorrami claimed that he thought Nolan was booting the car for an expired parking sticker. He told Nolan that he was legally parked and that he had recently paid off his outstanding tickets. Nolan said that she had no information on the tickets and repeatedly told Khorrami that he was "going to get booted" and that he was not permitted to get into or drive his car.

Khorrami was concerned that the deliveries would be late and that the flowers would wilt. He decided that he was going to "go to the city and clear this." Khorrami ignored Nolan's attempts to block him and insisted, "it's my car, I can get into my car and I'm going to go to the city right now and clarify that." Khorrami pushed past Nolan, got into the car, and started the engine.

Because all previous boots were installed on the right rear tire, Khorrami testified, he looked in the curbside mirror to confirm that the rear tire was not

5

booted. After he released the parking brake and shifted into reverse, the car "kind of wiggled."

> As soon as the car wiggled, all of a sudden I see Officer Calderon very first time since the whole day started with this ordeal, I saw her completely standing up and pounding her right hand on the middle of my front hood very harshly, very strongly.

Khorrami claimed that Nolan never told him that Calderon was in the process of booting his car and that he never saw Calderon at any time. He acknowledged, however, that a tree and sandwich board sign on the sidewalk in front of his shop did not block his view of the right side of his car as he approached Nolan.

The State charged Khorrami with one count of assault in the third degree. Following a three-day trial in July 2015, a jury found Khorrami guilty as charged. At sentencing, the court granted Khorrami a first-time offender waiver and imposed 232 hours of community service.

II

Khorrami contends that the trial court erroneously instructed the jury on the definition of criminal negligence. Instruction 6, the "to convict" instruction for assault in the third degree, provided in pertinent part:

> To convict the defendant of the crime of assault in the third degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about August 27, 2014, the defendant caused bodily harm to Arlene C. Calderon;
> (2) That the physical injury was caused by a weapon or other instrument or thing likely to produce bodily harm;

6

(3) That the defendant *acted with criminal negligence*; and

(4) That this act occurred in the State of Washington.

(Emphasis added.)

Instruction 8 defined criminal negligence:

A person is criminally negligent or acts with criminal negligence when he or she fails to be aware of a substantial risk that *a wrongful act* may occur and this failure constitutes a gross deviation from the standard of care that a reasonable person would exercise in the same situation.

When criminal negligence as to a particular result or fact is required to establish an element of a crime, the element is also established if a person acts intentionally, knowingly, or recklessly as to that result or fact.

(Emphasis added.)

Khorrami asserts that the instruction defining criminal negligence was deficient because it required only the risk of a general undefined "wrongful act" rather than the specific risk of bodily harm to Calderon identified in the "to convict" instruction. He argues that the erroneous definition of criminal negligence therefore relieved the State of its burden to prove an essential element of assault in the third degree.

Under the invited error doctrine, "[a] party may not request an instruction and later complain on appeal that the requested instruction was given." State v. Boyer, 91 Wn.2d 342, 345, 588 P.2d 1151 (1979). Contrary to Khorrami's suggestion, the invited error doctrine precludes review even if the State proposed the same instructions. See In re Pers. Restraint of Griffith, 102 Wn.2d 100, 102, 683 P.2d 194 (1984).

7

Here, Khorrami did not object to the trial court's instructions and proposed instructions identical to those he now challenges. The invited error doctrine therefore precludes review. See State v. Studd, 137 Wn.2d 533, 546-47, 973 P.2d 1049 (1999) (invited error doctrine precluded review of clearly erroneous instructions defining self-defense that defense counsel proposed).

Moreover, Khorrami's primary challenge on appeal is directed to the instruction defining criminal negligence. Generally, alleged errors in definitional instructions are not errors of constitutional magnitude and, thus, will not be addressed for the first time on appeal. See State v. Duncalf, 164 Wn. App. 900, 911, 267 P.3d 414 (2011), aff'd, 177 Wn.2d 289, 300 P.3d 352 (2013). Khorrami fails to demonstrate a manifest constitutional error under RAP 2.5(a)(3). Cf. State v. Johnson, 180 Wn.2d 295, 306-07, 325 P.3d 135 (2014) (in prosecution for assault in the second degree, reference to "a wrongful act" in instruction defining "reckless" did not relieve the State of its burden of proof where the "to convict" instruction included the charge-specific "substantial bodily harm" element).

### III

Khorrami contends that the alleged instructional error was compounded when the trial court responded to a jury question. During deliberations, the jury inquired whether the "substantial risk" referenced in Instruction 8 was "specific to the crime – being injury to PEO Calderon" or the "awareness of substantial risk in

general." The trial court, after consulting with counsel, provided no additional information and instructed the jury to rely on "all your instructions, the evidence admitted in the case, and argument of counsel."

On appeal, Khorrami asserts that the trial court should have informed the jury that Instruction 8 referred to the specific risk to PEO Calderon, not merely a general risk. But Khorrami did not propose such a response or otherwise object to the court's answer to the jury inquiry. He cannot challenge the court's response for the first time on appeal. State v. Cordero, 170 Wn. App. 351, 371, 284 P.3d 773 (2012).

Because we do not review the propriety of the challenged instructions, we need not address Khorrami's claim that the jury's inquiry and a postverdict e-mail from one of the jurors to the trial judge evidenced the alleged instructional deficiency.

IV

Khorrami contends that the evidence was insufficient to support his conviction. Relying on evidence that he never saw PEO Calderon, that PEO Nolan said only that his car "was going to get booted" and did not inform him that Calderon was in the process of booting the car, and that Nolan was unable to see Calderon from her position near the driver's door of his car, Khorrami argues that the State failed to prove that he acted with criminal negligence.

An appellate court reviews the sufficiency of the evidence to determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt. State v. Pirtle, 127 Wn.2d 628, 643, 904 P.2d 245 (1995). "A claim of insufficient evidence admits the truth of the State's evidence and all inferences that reasonably can be drawn from that evidence." State v. Caton, 174 Wn.2d 239, 241, 273 P.3d 980 (2012). We consider circumstantial and direct evidence to be equally reliable. State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

To convict Khorrami of assault in the third degree, as charged herein, the State was required to prove that, with criminal negligence, he cause bodily harm to Calderon "by means of a weapon or other instrument or thing likely to produce bodily harm." RCW 9A.36.031(1)(d). A person acts with criminal negligence "when he or she fails to be aware of a substantial risk that a wrongful act may occur and his or her failure to be aware of such substantial risk constitutes a gross deviation from the standard of care that a reasonable person would exercise in the same situation." RCW 9A.08.010(1)(d).

The State's evidence established that Khorrami was very familiar with the booting process and the procedure for unlocking the boot. Khorrami was also aware that during all of the prior incidents, the parking enforcement officers had placed the boot on the right side of Khorrami's car. After advising his son that it

would not take a long time to unlock the Honda, Khorrami aggressively confronted PEO Nolan and claimed he was going to drive "to the city" to clear up the apparent mistake. Nolan repeatedly told him that his car was already booted, ordered him not to get into the car, and attempted to physically block his entrance. Khorrami ignored Nolan's admonitions and pushed past her. Khorrami then started the car and put it into gear, causing Calderon's injuries.

Khorrami relies heavily on his own testimony that Nolan used only the future tense to describe the booting process and that he did not see Calderon as he approached Nolan. But Khorrami passed no more than a few feet from Calderon, who was kneeling next to the right front tire, as he approached Nolan from the front of his car. The weather was sunny, and Calderon was wearing a bright fluorescent green vest and holding a large yellow metal boot, supporting an inference that she was easily visible. Khorrami also acknowledged that nothing blocked his view of the right side of the car as he approached Nolan and that Nolan referred to "we" at one point, implying the presence of another officer. Whether or to what extent Khorrami noticed Calderon and the precise words that Nolan used to describe the situation involve credibility issues that we cannot resolve on appeal. See State v. Hayes, 81 Wn. App. 425, 430, 914 P.2d 788 (1996) (appellate court defers to trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence).

When the evidence is viewed in the light most favorable to the State, a rational trier of fact could find that Khorrami failed to be aware of a substantial risk that Calderon would suffer bodily harm and that this failure constituted a gross deviation from the standard of care that a reasonable person would exercise in the same situation. The evidence was sufficient to establish that Khorrami was criminally negligent and support his conviction for assault in the third degree.

Affirmed.

We concur: