IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| STATE OF WASHINGTON, | No. 85912-9-I |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| ADAM EZRA PARIS, | |
| Appellant. | |

BOWMAN, J. — Adam Ezra Paris appeals his jury convictions for two counts of rape of a child in the first degree and two counts of child molestation in the first degree. Paris argues that insufficient evidence supports his conviction for one count of child molestation. He also argues that the trial court erred by giving an "abiding belief" reasonable doubt jury instruction and concluding that Paris opened the door to prejudicial testimony. Paris also raises several issues in a statement of additional grounds for review (SAG). We affirm.

FACTS

In December 2010, Paris began dating Danielle,[1] who had two daughters, eight-year-old P.M. and five-year-old K.G.-R. In 2011, Paris moved in with Danielle and her children. After Paris moved in, he began to sexually assault P.M., which eventually became a daily occurrence. Paris also sexually assaulted

---

[1] Although now divorced, Danielle used the last name Paris at trial. For clarity, we refer to Danielle by her first name and mean no disrespect.

K.G.-R.  In 2012, Paris and Danielle married.  They then had two sons of their own, E.M.P. in 2013 and E.P. in 2016.

Because of digestive issues, K.G.-R. suffered from painful constipation and required a rectal suppository, which Danielle helped her administer.  Paris would insist on helping K.G.-R. insert the suppository, but Danielle consistently refused.  One day, Paris and K.G.-R. were home alone when K.G.-R. needed her medication.  Paris again insisted on helping her, but K.G.-R. refused.  Paris yelled at K.G.-R. until she complied.  He directed K.G.-R. to "get on all fours," or get down on the floor on her hands and knees, and removed her pants and underwear.  Rather than insert the rectal suppository, Paris repeatedly poked at and inserted his fingers into K.G.-R.'s vagina.

In November 2017, Danielle discovered photographs on their shared computer of Paris having sexual contact with the family dog.  Danielle also found a picture of P.M. mixed in with the photos.  This prompted her to contact the police, and the State charged Paris with animal cruelty.[2]  She also asked P.M. if Paris had ever touched her inappropriately, but P.M. did not disclose the abuse.  Danielle then filed for divorce in late November 2017 and in December 2017, she received a restraining order limiting Paris' contact with the children as part of the dissolution proceedings.

In early 2018, K.G.-R. disclosed the sexual abuse to her school counselor.  In February 2018, K.G.-R. and P.M. both met with a child forensic interviewer.  K.G.-R. described "weird cuddling" but did not disclose the extent of Paris' abuse.

---

[2] Paris pleaded guilty to animal cruelty in the second degree in June 2018.

P.M. also disclosed that Paris was inappropriate with her but did not disclose the extent of the abuse.

In January 2019, E.M.P. disclosed to Danielle that Paris sexually abused him. Later that month, P.M. disclosed to her therapist that Paris sexually assaulted her. That night, K.G.-R. also fully disclosed to Danielle that Paris sexually assaulted her. Then, in February 2019, P.M. and K.G.-R. both disclosed the abuse to a child forensic interviewer. Shortly after, in March, the State charged Paris with one count of rape of a child in the first degree and one count of child molestation in the first degree of P.M. and one count of rape of a child in the first degree and one count of child molestation in the first degree of K.G.-R.[3]

Before trial, Paris moved under ER 403 to exclude testimony about his animal cruelty conviction and the "underlying" photos of him with the family dog. The trial court granted the motion, determining that "the probative value [of the testimony] . . . is substantially outweighed by the prejudicial impact to defense." But the court explained that it would "revisit" the issue if defense solicited testimony "that raise[s] an issue about the reason for the mother pursuing the divorce."

At trial, P.M. and K.G.-R. testified in detail about Paris raping and molesting them. Danielle then testified about when and how the girls disclosed the abuse. On cross-examination, Paris asked Danielle questions about her attempts to limit his contact with the children, including when she filed for divorce

---

[3] The State also charged Paris with one count of first degree child rape and one count of first degree child molestation of E.M.P. The jury acquitted Paris of those charges, so they are not at issue in this appeal.

and her request for a restraining order. Paris then pointed out that Danielle alleged that he sexually assaulted the girls shortly after seeking the divorce and restraining order. And he elicited testimony that P.M. did not initiate her disclosure to Danielle. Instead, Danielle asked P.M. whether Paris had inappropriately touched her.

Outside the presence of the jury, the State argued that Paris' cross-examination opened the door to testimony about Danielle's discovery of the photos of Paris with the family dog because it put at issue Danielle's motivation in seeking a divorce and restraining order and prompting P.M. to tell her about any abuse. According to the State, Paris' questions suggested that Danielle "coached" the girls' disclosures for her own purpose in the dissolution proceedings. The trial court agreed and allowed Danielle to testify that she sought the restraining order and confronted P.M. only after she found "concerning" pictures of Paris and the family dog with a picture of P.M. mixed in.

At the close of trial, the court instructed the jury about reasonable doubt. It instructed the jury that reasonable doubt is "such a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence or lack of evidence." And if, "from such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt."

The jury convicted Paris of two counts of first degree child rape of P.M. and K.G.-R. and two counts of first degree child molestation of P.M. and K.G.-R. On December 16, 2022, the court sentenced Paris to a standard range,

indeterminate sentence under RCW 9.94A.507.  It imposed 292 months to life for the child rape counts and 182 months to life for the child molestation counts.

Paris appeals.

ANALYSIS

Paris argues that insufficient evidence supports his conviction for the one count of child molestation in the first degree of K.G.-R.  He also argues that the trial court erred by giving the jury an "abiding belief" reasonable doubt instruction and concluding that Paris opened the door to testimony about the photographs of him with the family dog.  Finally, Paris raises several issues in his SAG.  We address each argument in turn.

1. Sufficiency of the Evidence

Paris contends that insufficient evidence supports his conviction of child molestation in the first degree of K.G.-R.  We disagree.

Due process requires the State to prove each element of a charged crime beyond a reasonable doubt.  *State v. Johnson*, 188 Wn.2d 742, 750, 399 P.3d 507 (2017) (citing U.S. CONST. amend.  XIV; WASH. CONST. art. I, § 3).  We review a challenge to the sufficiency of the evidence de novo as a question of constitutional law.  *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016).  Such a challenge admits the truth of the State's evidence and all reasonable inferences from it.  *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).  So, we examine the evidence in a light most favorable to the State and determine whether any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt.  *Id.*  We "defer to the jury on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the

5

evidence." *State v. Loos*, 14 Wn. App. 2d 748, 765, 473 P.3d 1229 (2020). And we "consider circumstantial and direct evidence equally reliable." *Id.*

The court instructed the jury that to convict Paris of first degree child molestation of K.G.-R., it must find that "on or between January 1, 2011 and December 31, 2017, in an incident separate and distinct from any other count, the defendant had sexual contact with [K.G.-R.]." The court further instructed the jury that "sexual contact" means "any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desires of either party."

Paris argues that no evidence shows he acted for sexual gratification because "[t]he act of successfully inserting an enema into K.G.-R.'s anus to relieve constipation cannot be considered sexual." But K.G.-R. testified that Paris "never" inserted the suppository. Instead, K.G.-R. described getting "on all fours" and Paris standing behind her, "poking" and penetrating her vagina with his fingers.

Poking and penetrating K.G.-R.'s vagina is unrelated to the act of inserting a rectal suppository. And Paris engaged in those acts several times.[4] Viewing

---

[4] We note that first degree child rape and first degree child molestation are separate offenses and that the double jeopardy clause does not prevent convictions—and attendant penalties—for both offenses arising out of a single incident where the only evidence of sexual intercourse supporting the rape is penetration. *State v. Wilkins*, 200 Wn. App. 794, 807-08, 403 P.3d 890 (2017). But here, the court instructed the jury that it must find Paris committed first degree child molestation of K.G.-R. in an incident "separate and distinct from any other count." And unchallenged jury instructions become the law of the case. *State v. Hickman*, 135 Wn.2d 97, 102, 954 P.2d 900 (1998). The parties do not dispute that the act of penetration supports the jury's determination that Paris committed rape of a child in the first degree of K.G.-R. So, we focus on only the act of "poking" in our analysis.

the evidence in a light most favorable to the State, a reasonable jury could conclude that Paris acted for the purpose of sexual gratification.

2.  Reasonable Doubt Jury Instruction

Paris claims the trial court erred by instructing the jurors that if, after considering all the evidence, they had "an abiding belief in the truth of the charge," they are satisfied beyond a reasonable doubt.  We disagree.

We review a challenged jury instruction de novo, evaluating it in the context of the instructions as a whole.  *State v. Brett*, 126 Wn.2d 136, 171, 892 P.2d 29 (1995).  Although no specific wording is required, jury instructions must define "reasonable doubt" and clearly communicate that the State carries the burden of proof.  *State v. Bennett*, 161 Wn.2d 303, 307, 165 P.3d 1241 (2007).  Instructions must also properly inform the jury of the applicable law, not mislead the jury, and permit each party to argue its theory of the case.  *Id.*

Here, the trial court gave the jury the Washington Practice jury instruction for "reasonable doubt."  *See* 11 WASHINGTON PRACTICE:  WASHINGTON PATTERN JURY INSTRUCTIONS:  CRIMINAL 4.01, at 98 (5th ed. 2021) (WPIC).  It instructed the jury:

> A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence.  It is such a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence or lack of evidence.  If, from such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt.

Citing *State v. Emery*, 174 Wn.2d 741, 278 P.3d 653 (2012), Paris argues that the "court's instruction impermissibly encouraged the jury to undertake a search for the truth."

7

In *Emery*, the prosecutor told the jury during closing argument, " 'Members of the jury, I ask you, go back there to deliberate, consider the evidence, use your life experience and common sense, and speak the truth by holding these men accountable for what they did.' " 174 Wn.2d at 750-51. Our Supreme Court held that encouraging jurors to "speak the truth" was improper because "[t]he jury's job is not to determine the truth of what happened . . . . Rather, a jury's job is to determine whether the State has proved the charged offenses beyond a reasonable doubt." *Id.* at 760.

We rejected Paris' argument in *State v. Fedorov*, 181 Wn. App. 187, 199-200, 324 P.3d 784 (2014). In that case, we acknowledged that it is improper for a prosecutor to tell the jury to "speak the truth" because it misstates the jury's role. *Id.* at 200. But we distinguished *Emery* because "the 'belief in the truth' phrase accurately informs the jury its 'job is to determine whether the State has proved the charged offenses beyond a reasonable doubt.' " *Id.* at 200 (quoting *Emery*, 174 Wn.2d at 760).

Division Two of our court reached the same conclusion in *State v. Jenson*, 194 Wn. App. 900, 902, 378 P.3d 270 (2016) (adopting *Fedorov*). It concluded that the "existence or nonexistence of an 'abiding belief in the truth' . . . correctly invites the jury to weigh the evidence." *Id.*

Paris argues that our court wrongly decided *Fedorov* and *Jenson*. According to Paris, those cases relied on *State v. Pirtle*, 127 Wn.2d 628, 904 P.2d 245 (1995), and *State v. Bennett*, 161 Wn.2d 303, 165 P.3d 1241 (2007), and neither case directly addresses his argument.

In *Pirtle*, our Supreme Court approved a jury instruction that read, " 'If, after such consideration[,] you do not have an abiding belief in the truth of the charge, you are not satisfied beyond a reasonable doubt.' " 127 Wn.2d at 657-58.[5]  The court concluded that while the language was unnecessary, the trial court did not err by including it.  *Id.* at 658.  And in *Bennett*, our Supreme Court specifically approved the use of WPIC 4.01[6] as a whole because it "adequately permits both the government and the accused to argue their theories of the case."  161 Wn.2d at 317 (citing *Pirtle*, 127 Wn.2d at 656-58).

*Fedorov* and *Jenson* each cited *Pirtle* and *Bennett* and then independently determined that the "abiding belief in the truth" language in WPIC 4.01 serves a different purpose than the "speak the truth" language used by the prosecutor during closing in *Emery*.  *Fedorov*, 181 Wn. App. at 200; *Jenson*, 194 Wn. App. at 901-02.  And our Supreme Court denied review in both cases.  *State v. Fedorov*, 181 Wn.2d 1009, 335 P.3d 941 (2014); *State v. Jenson*, 186 Wn.2d 1026, 385 P.3d 119 (2016).  We decline the invitation to depart from that precedent.

3.  Testimony About Photographs

Paris argues that the trial court abused its discretion by admitting Danielle's testimony about the photographs of Paris engaged in "concerning"

---

[5] Emphasis omitted, alteration in original.

[6] The language in WPIC 4.01 has not changed since the *Bennett* decision.  *See* 11 WASHINGTON PRACTICE:  WASHINGTON PATTERN JURY INSTRUCTIONS:  CRIMINAL 4.01, at 79 (2d ed. Supp. 2005).

conduct with the family dog.[7]  The State contends Paris opened the door to the evidence when he questioned Danielle on cross-examination about initiating divorce proceedings and confronting P.M.  We agree with the State.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion.  *State v. Scherner*, 153 Wn. App. 621, 656, 225 P.3d 248 (2009).  A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds.  *Id.*  A trial court may admit only "relevant evidence."  ER 402.  Evidence is "relevant" if it tends to make the existence of any fact of consequence more or less probable than it would be without the evidence.  ER 401.

A court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice."  ER 403.  Still, the court "has discretion to admit evidence that might otherwise be inadmissible if the defendant opens the door to the evidence."  *State v. Warren*, 134 Wn. App. 44, 65, 138 P.3d 1081 (2006), *aff'd*, 165 Wn.2d 17, 195 P.3d 940 (2008).  The "open door" doctrine promotes fairness by preventing one party from raising a subject and then barring the other party from further inquiry.  *State v. Avendano-Lopez*, 79 Wn. App. 706, 714, 904 P.2d 324 (1995).  Indeed, " '[i]t would be a curious rule of evidence which allowed one party to bring up a subject, drop it at a point where it might appear advantageous to him, and then bar the other party from all

---

[7] Paris argues that the trial court "abused its discretion permitting the [S]tate to introduce evidence of Paris's animal cruelty conviction."  But the jury never heard evidence that the State charged Paris with that crime or that he pleaded guilty to it.

further inquiries about it.' " *State v. Bennett*, 42 Wn. App. 125, 127, 708 P.2d 1232 (1985)[8] (quoting *State v. Gefeller*, 76 Wn.2d 449, 455, 458 P.2d 17 (1969)).

Before trial, Paris moved under ER 403 to exclude any reference to the photographs Danielle found of him with the family dog. The court granted the motion because at that time, the prejudicial impact of the evidence "substantially outweighed" its probative value. But the court explained that "in the event that it becomes more precise that the defense is raising questions that raise an issue about the reason for [Danielle] pursuing the divorce[,] [i]f that becomes relevant in cross-examination, . . . the court without the jury present will revisit the issue."

During Danielle's cross-examination, defense counsel asked:

Q.    Okay. Now, [Paris] moved out of the house, the family home, on November 24th, 2017, correct?
A.    Yes.
Q.    Okay. November 25th, 2017 was the last day that [Paris] was ever in that house; is that correct?
A.    That is correct.
Q.    Okay. And five days later, on November 30th, 2017, you filed for divorce?
A.    I did.
Q.    Okay. As part of that divorce case, on December 7th, 2017, you obtained a restraining order barring [Paris] from the residence and limiting his contact with the two boys, right?
A.    Yes, I did.
Q.    Now, there was a guardian ad litem appointed in your divorce proceeding, correct?
A.    Yes.
      . . . .

---

[8] *Bennett* analyzes the admission of evidence under ER 404(b), which prohibits the admission of "[e]vidence of a person's character or a trait of character . . . for the purpose of proving action in conformity" with the current offense. The fourth element of the test in assessing whether to admit evidence of a person's prior misconduct under ER 404(b) "ensure[s] that the evidence does not run afoul of . . . ER 403." *State v. Gresham*, 173 Wn.2d 405, 421, 269 P.3d 207 (2012) (courts must weigh the probative value of the evidence against its prejudicial effect).

Q.      . . . Did a portion of that guardian ad litem report to the court have to do with recommendations on child custody and visitation?

A.      Yes.

Q.      Okay.  And a couple days after the report was filed, you filed a declaration in response to that guardian ad litem report, correct?

A.      I believe so.

Q.      And that was because you didn't agree with some of the recommendations by the guardian ad litem regarding how much visitation [Paris] should have with [E.M.P.] and [E.P.]?

A.      I can't fully disclose on everything.

Q.      Okay.  Fair enough.

. . . .

Q.      Do you remember the court issuing an order regarding [Paris'] opportunity to visit with the girls?

A.      Yes, I do.

Q.      Okay.  Do you remember objecting to it or disagreeing with it?

A.      I do remember.

Q.      And that was around the fall of 2018?

A.      Timeline, I'm not clear.  I'm sorry.

Q.      That's okay.  No, I appreciate that.  That's totally fine.
        And then fast forward about — I guess it's about four months.  January 1st, 2019, that is the day that [E.M.P.] disclosed to you that he had been the victim of sexual abuse at the hands of [Paris], his father, right?

A.      That's around the time he did come forward about some of what happened, yes.

Q.      Okay.  And then just over two weeks after that, January 18th, 2019, you were the recipient of additional disclosures by [P.M.] and [K.G.-R.] that [Paris] had sexually abused them as well?

A.      I was secondary on [P.M.] and then yes, [K.G.-R.].

Q.      Okay.  And you learned of their disclosures either secondarily or primarily on the very same day?

A.      Yes, I did.

Q.      Okay.  And that was the same day that [E.M.P.] was being forensically interviewed . . . ?

A.      Yes, it was.

. . . .

Q.      I'd like to ask you a few questions about [P.M.], if I may.
        You indicated that her disclosure to you occurred in the car while [E.M.P.] was at an occupational therapy appointment?

A.      Yes.

Q.      And it was just the two of you in the car?

12

A.  Yes, it was.

Q.  And that was the first time that [P.M.] ever told you that [Paris] had touched her in a sexual or inappropriate way?

A.  That was the first time I'd gotten more of an open conversation, so yes.

Q.  Do you recall asking [P.M.] in November 2017 directly, "Has [Paris] ever touched you inappropriately?"

A.  There is a problem with asking that question, sir.  I can't really answer.

Q.  Okay.  I will move on then.

Outside the presence of the jury, the State argued defense counsel's questions opened the door to testimony about Danielle finding the pictures of Paris with the family dog.  It explained that the defense "paint[ed] a picture of [Danielle] coaching the children along the [divorce] process because she's trying to put a separation between the defendant and the kids," when actually the pictures of Paris with the dog and the photo of P.M. mixed in motivated Danielle to seek the divorce and restraining order and to confront P.M. about Paris' abuse.

The trial court agreed.  It allowed the State to ask Danielle "what motivated you to seek a restraining order in December of 2017" and "what motivated you to ask [P.M.] . . . during that same timeframe . . . about whether the defendant had touched her inappropriately."[9]  Danielle testified, "Because of

---

[9] The court also read the jury a limiting instruction before Danielle's redirect examination by the State:

> [The prosecutor] is going to ask the witness some questions, and you are being — evidence is being allowed by me to be inquired into on the topic of why the witness pursued a restraining order and why the witness asked a particular question of her daughter.  You are being allowed to hear this evidence only for the limited purpose of hearing the motivation behind the witness taking those actions and not for any other purpose, so the use of that evidence is only for the limited purpose of the why from the witness.

photos I found of . . . Paris and the family dog - it was concerning to me - and within those pictures a photo of my daughter [P.M.]."

Because Paris' questions on cross-examination put at issue Danielle's motivation to seek a restraining order and ask P.M. directly whether Paris had ever inappropriately touched her, the trial court did not abuse its discretion by allowing Danielle to testify about the source of her motivation.

4.  SAG

In his SAG, Paris argues that the trial court erred by dismissing an impaneled juror, failing to instruct the jury on "the medical exception to sexual intercourse," failing to engage in a "same criminal conduct" analysis when calculating his offender score, and imposing an unlawful enhanced sentence.

A.  Biased Juror

Paris argues the trial court erred by dismissing a juror for bias at the close of the evidence.  We disagree.

We review a trial court's decision to excuse a juror for an abuse of discretion.  *State v. Hughes*, 106 Wn.2d 176, 204, 721 P.2d 902 (1986); *State v. Sassen Van Elsloo*, 191 Wn.2d 798, 806-07, 425 P.3d 807 (2018).  The trial court "has the advantage of observing a juror's demeanor" and is " 'in the best position to determine a juror's ability to be fair and impartial.' "  *State v. Teninty*, 17 Wn. App. 2d 957, 964, 489 P.3d 679 (2021) (quoting *State v. Noltie*, 116 Wn.2d 831, 839, 809 P.2d 190 (1991)).  So, we "will uphold a trial court's decision so long as it falls within the broad range of reasonable decisions."  *Id.*

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to a fair trial "by an

impartial jury." Under RCW 2.36.110, a trial judge has a duty "to excuse from further jury service any juror, who in the opinion of the judge, has manifested unfitness as a juror by reason of bias . . . or by reason of conduct or practices incompatible with proper and efficient jury service." RCW 2.36.110 places a continuous obligation on the trial court to excuse any juror who is unfit and unable to perform their duties as a juror. *State v. Jorden*, 103 Wn. App. 221, 227, 11 P.3d 866 (2000). To dismiss an impaneled juror for actual bias, the challenging party must show that the juror "has formed or expressed" a biased opinion and that the juror "cannot disregard such opinion and try the issue impartially." RCW 4.44.190.

Before closing arguments, juror 11 realized that he had "played music together with the defendant [at church events] for about 20 times over the last year." The trial court dismissed the juror because "[t]hat close connection can lead to an inference of bias and prejudice and not being able to be impartial." Paris argues he is entitled to a new trial because the court failed to establish that the juror was actually biased. We need not reach that issue because Paris fails to show prejudice.

Prejudice exists and a defendant is entitled to a new trial when the erroneous dismissal of an impaneled juror "stems from concern over the juror's views of the merits of the evidence presented." *Sassen Van Elsloo*, 191 Wn.2d at 815. But when the erroneous dismissal of an impaneled juror does not stem from concern over the juror's views of the merits of the evidence presented, no new trial is warranted if any error was harmless. *Id.* Error is harmless if we can say, " 'with fair assurance, after pondering all that happened without stripping the

15

erroneous action from the whole, that the judgment was not substantially swayed by the error.' " *Id.* at 823[10] (quoting *Hinton v. United States*, 979 A.2d 663, 690-91 (D.C. Cir. 2009)).

The trial court did not excuse juror 11 based on concern about the juror's view of the merits of the evidence presented. And Paris makes no argument that any error substantially swayed his verdict. Indeed, we presume an alternate juror is unbiased. *Sassen Van Elsloo,* 191 Wn.2d at 822. As a result, the release of juror 11 had no substantial influence on the outcome of the trial, and any error was harmless.

### B. Medical Exception Instruction

Paris argues that the facts of his case supported a jury instruction on the "medical exception" to "sexual intercourse." He now asserts his conduct with K.G.-R. was for medical purposes because he inserted a suppository into K.G.-R.'s rectum to treat her constipation. According to Paris, the failure to provide such an instruction violated his right to due process by preventing him from presenting a complete defense. But the evidence adduced at trial did not support such an instruction.

While the trial court must fully instruct the jury on the applicable law, there is no right to an instruction that is not supported by the evidence. *State v. Prado*, 144 Wn. App. 227, 241, 181 P.3d 901 (2008). And there is no evidence in the record to suggest that Paris inserted a suppository into K.G.-R's rectum. First, as discussed above, K.G.-R. testified that Paris did not insert a suppository and,

---

[10] Internal quotation marks omitted.

16

instead, repeatedly touched and poked her vagina. That conduct is unrelated to the act of inserting a suppository. Further, Paris completely denied the allegation at trial, testifying that he "never helped [K.G.-R.] insert suppositories in her anus." As a result, the evidence did not support the trial court giving a "medical exception" instruction.

### C. Same Criminal Conduct

Paris argues that the trial court erred in failing to engage in a "same criminal conduct analysis" when calculating his offender score. Paris waived this argument on appeal because he did not seek a same criminal conduct analysis at sentencing.

"We review a sentencing court's calculation of an offender score de novo." *State v. Tili*, 148 Wn.2d 350, 358, 60 P.3d 1192 (2003). The sentencing court follows the guidelines of the Sentencing Reform Act of 1981, chapter 9.94A RCW, to calculate an offender score. *See* RCW 9.94A.525, .510. In calculating an offender score, the court must (1) identify all prior convictions, (2) eliminate those that "wash out," and (3) count the prior convictions that remain. *State v. Moeurn*, 170 Wn.2d 169, 175, 240 P.3d 1158 (2010).

If a trial court finds that some or all of a defendant's current crimes encompass the same criminal conduct, the court must count those offenses as a single crime to calculate the defendant's offender score. RCW 9.94A.589(1)(a). But a defendant must request that the trial court conduct a same criminal conduct analysis at sentencing to preserve the issue for appeal. *State v. Jackson*, 28 Wn. App. 2d 654, 667-68, 538 P.3d 284 (2023).

Paris did not ask the sentencing court to engage in a same criminal conduct analysis. Indeed, Paris told the court that he is "not arguing that [the child rape and child molestation] counts . . . are [the] same criminal conduct" because the law would not support such a finding.[11] Paris waived the issue for appeal.

D. Sentencing Enhancement

Paris also argues that the trial court unlawfully elevated his minimum sentence by imposing an indeterminate sentence under RCW 9.94A.507 because "any fact that increases a mandatory statutory minimum is required to be submitted to a jury." We disagree.

Whether an issue presents a question of law or fact is a question of law that we review de novo. State v. Mullen, 186 Wn. App. 321, 328, 345 P.3d 26 (2015). Under RCW 9.94A.507(1)(a)(i) and (3), a person convicted of rape of a child in the first degree or child molestation in the first degree is subject to a minimum and maximum term of confinement. In such cases, the minimum term must be either within the standard range or, if grounds for an exceptional sentence apply, it may be outside the standard range. RCW 9.94A.507(3)(c)(i). The maximum term "shall consist of the statutory maximum sentence for the offense." RCW 9.94A.507(3)(b). The statute also requires an offender to comply

---

[11] The State and Paris both told the court that under State v. Torrence, No. 52432-5-II, slip op. at 13-19 (Wash. Ct. App. Oct. 6, 2020) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2 52432-5-II Unpublished Opinion.pdf, convictions for first degree child rape and first degree child molestation do not constitute the same criminal conduct because each crime requires a different criminal intent.

with the Indeterminate Sentence Review Board and provides for community custody up to the maximum term of a sentence.  RCW 9.9A.507(5), (6).

In support of his argument, Paris cites *Alleyne v. United States*, 570 U.S. 99, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013).  In *Alleyne*, the United States Supreme Court held that under the Sixth Amendment, any fact (i.e., a sentencing factor) that increases punishment for a crime is an "element" of that crime and "must be submitted to the jury and proved beyond a reasonable doubt."  *Id.* at 107-08.

Here, the trial court imposed a minimum term of 292 months—a sentence within his standard range.[12]  So, the trial court did not elevate his minimum sentence.  In any event, as much as Paris characterizes RCW 9.94A.507 as increasing his punishment based on facts that must be decided by a jury, the statute does not defy *Alleyne*.  Paris is subject to the indeterminate sentencing statute only because a jury determined beyond a reasonable doubt the facts sufficient to support his convictions for first degree rape of a child and first degree child molestation.  In turn, those convictions authorized the trial judge to impose an indeterminate sentence under RCW 9.94A.507.

In sum, sufficient evidence supports Paris' conviction for child molestation in the first degree of K.G.-R., and the trial court did not err by instructing the jury that it is satisfied beyond a reasonable doubt if "you have an abiding belief in the truth of the charge[s]" and concluding that Paris opened the door to testimony

---

[12] Paris had an offender score of 9, making the standard range on the most serious offense 240 to 318 months.

about the photographs of him with the family dog.  Finally, none of the issues Paris raises in his SAG amount to error.

We affirm Paris' convictions for two counts of rape of a child in the first degree and two counts of child molestation in the first degree of P.M. and K.G.-R.

_Brennan, J._

WE CONCUR:

_Chung, J._          _Mann, J._